346 A.2d 35

BOARD OF EDUCATION OF the SCHOOL DISTRICT
OF PHILADELPHIA, Appellant,

v.

PHILADELPHIA FEDERATION OF TEACHERS
LOCAL NO. 3, AFT, AFL–CIO.

Supreme Court of Pennsylvania.

Argued April 11, 1975.

Decided Oct. 3, 1975.

Vincent J. Salandria, Philadelphia, for appellant.

Leonard M. Sagot, Randall J. Sommovilla, Thomas W. Jennings, Philadelphia, for appellee, Philadelphia Federation of Teachers, Local No. 3, AFT, AFL–CIO; Teitelman, Sagot, Herring, Jennings & Luber, Philadelphia, of counsel.

Before EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

ROBERTS, Justice.

 This appeal presents the important question of whether a school district may agree in a collective bargaining agreement to submit to arbitration the propriety of discharging a non-tenured teacher. The court of common pleas held that it may do so. We agree, and therefore affirm.

■ The collective bargaining agreement between the Philadelphia Board of Education and the Philadelphia Federation of Teachers provides that "[a] teacher or other employee who does not have tenure shall not be subjected to discipline or discharge except for just cause." It also establishes a comprehensive grievance procedure, terminating in arbitration.[1] On July 8, 1974,

1. The grievance procedure is set out in article B–VIII of the agreement, which provides, in pertinent part:

"Section 1. Definitions

1a. A grievance is a complaint involving the work situation, that there is a lack of policy; that a policy or practice is improper or unfair; or that there has been a deviation from, or a misinterpretation or misapplication of a practice or policy; or that there has been a violation, misinterpretation, misapplication, inequitable or otherwise improper application of any provision of this Agreement. The development or modification of a system-wide salary schedule is not considered a grievance.

. . . . . . . . . .

1c. Nothing within this procedure shall be construed to deny to any employe his rights under any applicable law.

Section 2. Procedure for Adjustment of Grievances

Grievances and problems shall be presented and adjusted in accordance with the following procedure: . . . .

Step 3a. Within twenty-five school days after receiving the decision of the Executive Director of Personnel, the Board or the Federation may submit the matter to arbitration if the grievance, complaint or problem involves the compliance with, or application or interpretation of this Agreement, provided that a grievance concerning any Board action, not inconsistent with any provision of this Agreement, taken under any term of this Agreement requiring or providing for exercise of the Board's discretion or policymaking powers, may be decided by an arbitrator only if it is based on a complaint that such action was applied in a manner inconsistent with the general practice under such action followed throughout the school system in similar circumstances.

Step 3b. The method for submitting a matter to arbitration shall be as follows:

. . . .

Step 3c. The arbitrator shall issue his decision not later than 30 days after the date of the closing of the hearings or, if oral hearings have been waived, then 30 days from the date of transmitting the final statements and proof to the arbitrator. The decision shall be in writing and shall set forth the arbitrator's opinion and conclusions on the issues submitted. The arbitrator shall have the power and authority to decide, and shall limit his decision strictly to the matters specified in paragraph

the board notified Edgar Vahey, a non-tenured teacher, that he was suspended from his position pending dismissal. The union asserted that this was improper under the agreement and, pursuant to the grievance procedure, demanded arbitration and initiated the procedure for the selection of arbitrators. The board then filed a complaint in equity seeking to enjoin the arbitration on the ground that the agreement to submit employee discharges to arbitration was an unlawful delegation of the exclusive power of the board. The union filed preliminary objections in the nature of a demurrer, and these were sustained. This appeal followed.[2]

a of this Step 3; he shall be without power or authority to make any decision:

Step 3c(i) Contrary to, or inconsistent with, or which modifies or varies in any way, the terms of this Agreement or of applicable law or rules or regulations having the force and effect of law; or

Step 3c(ii). Which limits or interferes in any way with the powers, duties, and the responsibility of the Board under its By-laws, applicable law and rules and regulations having the force and effect of law, except that this clause (ii) shall not be deemed to limit the arbitrator's authority to make decisions or awards which he is authorized to make under this paragraph c on the matters set forth in paragraph 2 of this Step 3.

The decision of the arbitrator, if made in accordance with his jurisdiction and authority under this Agreement will be accepted as final by the parties and both will abide by it."

2. Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P.L. 673, art. II, § 202(4), 17 P.S. § 211.202(4) (Supp.1974).

The order sustaining the preliminary objections did not explicitly dismiss the complaint, but rather directed that the matter be submitted to arbitration and retained on the docket until the arbitration was completed and a copy of the arbitrator's decision presented to the court. The union has moved to quash the appeal relying upon the rule that where preliminary objections have been sustained without dismissing the complaint, the order is normally interlocutory. *Micklege v. Capozzi,* 455 Pa. 551, 316 A.2d 887 (1974); *Hudock v. Donegal Mutual Insurance Co.,* 438 Pa. 272, 276, 264 A.2d 668, 671 (1970). This rule has no application here.

The order did not give the board leave to amend its complaint, but rather directed that the arbitration proceed. Clearly the only purpose of retaining the action on the docket was to facilitate review and enforcement of whatever order the arbitrator might issue, a matter not within the scope of the original action. Thus, the order of the trial court is one which "does, in effect, termi-

The board maintains that the provisions of the collective bargaining agreement here involved illegally delegate to an arbitrator the powers conferred exclusively on the board by sections 510 and 514 of the Public School Code of 1949.[3] Consequently, it is argued, those provisions are invalid under section 703 of the Public Employee Relations Act[4] (PERA) insofar as they provide

nate the action between the parties, or so restricts the pleader . . . as virtually to put him out of court on the cause of action he seeks to litigate." *Hudock,* supra, at 276, 264 A.2d at 671. The order was therefore final.

3. "The board of school directors in any school district may adopt and enforce such reasonable rules and regulations as it may deem necessary and proper, regarding the management of its school affairs and the conduct and deportment of all superintendents, teachers, and other appointees or employes during the time they are engaged in their duties to the district . . . ."
Act of March 10, 1949, P.L. 30, art. V, § 510, 24 P.S. § 5–510 (1962).
"The board of school directors in any school district except as herein otherwise provided, shall after due notice, giving the reasons therefor, and after hearing if demanded, have the right at any time to remove any of its officers, employes, or appointees for incompetency, intemperance, neglect of duty, violation of any of the school laws of this Commonwealth, or other improper conduct."
Id. § 514, 24 P.S. § 5–514.
Mr. Justice Pomeroy's dissenting opinion asserts that the board's reliance upon section 514 is misplaced because the provisions relevant to discharge of non-tenured teachers are sections 1108 and 1122 of the Public School Code of 1949, 24 P.S. §§ 11–1108, 11–1122. We find it unnecessary to determine this question because we conclude that it does not affect our analysis, as will be shown. See notes 10a & 14a infra. For the same reason we need not determine the propriety of an appellate court's raising of such an issue sua sponte. See *Benson v. Penn Central Transportation Co.,* 463 Pa. 37, 41, 342 A.2d 393, 395 (1975) (filed July 7); *Wiegand v. Wiegand,* 461 Pa. 482, 337 A.2d 256 (1975).

4. That section provides:
"The parties to the collective bargaining process shall not effect or implement a provision in a collective bargaining agreement if the implementation of that provision would be in violation of, or inconsistent with, or in conflict with any statute or statutes enacted by the General Assembly of the Commonwealth of Pennsylvania or the provisions of municipal home rule charters."
Act of July 23, 1970, P.L. 563, No. 195, art. VII, § 703, 43 P.S. § 1101.703 (Supp.1974).

for arbitration of grievances concerning discharge of non-tenured teachers.[5]

We cannot agree.

This Court has recently discussed the meaning of section 703 in *Pennsylvania Labor Relations Board v. State College Area School District*, 461 Pa. 494, 508–510, 337 A.2d 262, 269 (1975) (filed April 17, 1975). There Mr. Justice Nix wrote for the Court:

"The mere fact that a particular subject matter may be covered by legislation does not remove it from collective bargaining under section 701 if it bears on the question of wages, hours and conditions of employment. We believe that section 703 only prevents the agreement to and implementation of any term which would be in violation of or inconsistent with any statutory directive. The distinction between this view and that expressed by the majority of the Commonwealth Court (as we understand it) is best illustrated by an example. Under section 1142 of the Public School Code, a minimum salary scale is set forth. Section 1151 provides that school boards may pay salaries in

5. The board also contends that the type of dispute involved in this case is excluded from the scope of the grievance procedure by Article B–1 of the agreement, which provides:

"The parties recognize that the Board of Education has unilateral authority in the field of educational policy and development. This Agreement is not intended to modify by any of its terms any discretionary authority concerning such matters vested in the Board by the statutes of the Commonwealth or the Home Rule Charter."

Whatever may be the merits of this contention, see *United Steelworkers v. American Manufacturing Co.*, 363 U.S. 564, 80 S. Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); *Borough of Ambridge Water Authority v. Columbia*, 458 Pa. 546, 328 A.2d 498 (1974), it was not presented to the trial court and is therefore unavailable on appeal. *Wenzel v. Morris Distributing Co.*, 439 Pa. 364, 373–74, 266 A.2d 662, 667 (1970); *Corabi v. Curtis Publishing Co.*, 437 Pa. 143, 150, 262 A.2d 665, 668 (1969). However, this will not preclude presentation of this contention to the arbitrator.

excess of the minimum salary. Framing the issue in accordance with the formulation suggested by the majority in the Commonwealth Court, section 1142 created a duty not to pay below the minimum scale and section 1151 granted the employer the prerogative to pay more than the minimum rate. Clearly, the parties are precluded from agreeing to a rate lower than the minimum scale but even though the statute vested in the public employer the prerogative to pay a higher rate to do so as a result of collective bargaining is not 'in violation of, or inconsistent with, or in conflict with' the statute in question. The mere fact that the General Assembly granted the prerogative to the employer does not exclude the possibility that the decision to exercise that prerogative was influenced by the collective bargaining process.

". . . . Section 703 merely prevents a term of a collective bargaining agreement from being in violation of existing law. Cf. *Board of Education, City of Englewood v. Englewood Teachers Ass'n*, 64 N.J. 1, 311 A.2d 729 (1973); *Board of Education of Union Free School District # 3 v. Associated Teachers of Huntington, Inc.*, 30 N.Y.2d 122, 331 N.Y.S.2d 17, 282 N.E.2d 109 (1972); *Joint School District # 8 v. Wisconsin Employment Relations Board*, 37 Wis.2d 483, 155 N.W.2d 78 (1967). If however the General Assembly mandates a particular responsibility to be discharged by the board and the board alone, then the matter is removed from bargaining under section 701 even if it has direct impact upon 'wages, hours and other terms or conditions of employment.' "

The issue then is whether the challenged provisions of the collective bargaining agreement delegate to the arbitrator a responsibility which the General Assembly has commanded shall be "discharged by the board and the board alone." [6] In deciding this question, other provi-

---

6. The dissent contends that we have improperly confined our consideration of the board's claim to a determination of whether ar-

sions of the PERA are of particular significance because the PERA itself altered the board's previously exclusive control of most subjects within its competence and "[repudiated] . . . the traditional concept of the sanctity of managerial prerogatives in the public sector." Id. at 504, 337 A.2d at 267.

The General Assembly, far from forbidding arbitration of disputes arising out of a collective bargaining agreement, expressly commands it in section 903 of the PERA, which provides, in pertinent part:

"Arbitration of disputes or grievances arising out of the interpretation of the provisions of a collective bargaining agreement is mandatory. . . . [T]he final step [of the grievance procedure] shall provide for a binding decision by an arbitrator . . . ." [7]

This policy is even stronger than that embodied in federal labor policy. See *United Steelworkers v. American Manufacturing Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed. 2d 1403 (1960) ; *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). Federal policy merely favors the submission of disputes to arbitration, while the PERA requires it.

bitration of grievances over discharges is "in violation of" existing law and ignored the question of whether it is "inconsistent with, or in conflict with" existing law. It then concludes that such arbitration is inconsistent with the Public School Code because it constitutes "a delegation of a paramount board responsibility which . . . is at least wholly inconsistent with the statutory scheme which the Code embodies." Post, at 47.

Were we in agreement with the latter proposition, we would also agree that section 703 of the PERA would forbid implementation of the provision in question. However, as will be seen, we have examined the statutory scheme and concluded that there is no inconsistency. Thus the dissent's disagreement with our analysis centers on this point rather than turning upon any fundamental difference in the construction of section 703.

7. Act of July 23, 1970, P.L. 563, No. 195, art. IX, § 903, 43 P.S. § 1101.903 (Supp.1974).

It is not difficult to perceive the reasons for the statutory requirement that grievances be submitted to arbitration. If a dispute arises as to the interpretation or application of the agreement there must be a mechanism for resolving the dispute or the agreement is meaningless. Historically, the primary means of resolving such disputes was the strike, and many agreements in the private sector retain this mechanism for at least some types of dispute.[8] However, resolution of all disputes by resort to economic force is costly to the parties, and more importantly, to the public. The General Assembly therefore chose to make the widely used procedure of labor arbitration mandatory under the PERA. This brings the special expertise of labor arbitrators to bear on the often difficult problems of administering the collective bargaining agreement while assuring parties that their agreement will be effective and guaranteeing both the parties and the public that such disputes will not disrupt peaceful labor relations or interrupt public services.[9]

8. See Feller, A General Theory of the Collective Bargaining Agreement, 61 Calif.L.Rev. 663, 745–47 (1973). For an excellent discussion of the nature and functions of the collective bargaining agreement and the role of arbitration in administering such an agreement, see id. at 718–71, esp. 740–55.

9. Other advantages of grievance arbitration in governmental labor relations have been noted by one commentator, in the course of discussing its propriety:
"The basic objection to the propriety of binding arbitration as the final step in a grievance procedure is similar to the legal arguments against it; even if the use of arbitration is not an unlawful delegation of legislative authority, it is at least improper and unwise to 'remove from the . . . people a power vested in them.' Underlying this argument is the fear that arbitration may compel management to accept decisions which violate existing laws or official rules and regulations. This fear is founded on the belief that the arbitrator is going to ignore the law and act capriciously. This flies in the face of the American experience with arbitration and judicial review of arbitration awards. Of the several reasons behind the reluctance of public employers to agree to binding arbitration of grievances, the most important appears to be the desire not to relinquish unnecessarily any power to the unions.
"Binding arbitration of grievances, however, has much to commend it. First, the collective bargaining agreement is more

The board, however, maintains that the subject matter of this dispute requires that it be excluded from the general mandate to arbitrate. It bases this contention on sections 510 and 514 of the Public School Code of 1949.[10] We conclude that these provisions do not preclude the submission to arbitration of this type of dispute.

Section 510 empowers the board to "adopt and enforce" regulations "regarding the management of its school affairs and the conduct and deportment of all . . . teachers . . . during the time they are

> meaningful because the confidence of the workers in the equity of the agreement is strengthened when they know that any dispute over the meaning of the contract may be submitted to an impartial third party for decision. Second, it encourages more careful decision making by the government employer. If he knows that his actions may be subjected to the scrutiny of an arbitrator whose decision will be binding, he will be less likely to make hasty decisions and more likely to calculate the effect of his order. Third, it would create pressure to settle grievances at lower levels. The natural reluctance of management officials to have their decisions reviewed by outside parties reduces the tendency of upper-level management to uphold unjust decisions made by lower-level management. Fourth, if the parties must bear the cost of arbitration by outside parties, they are likely to attempt to resolve their differences before such expense is incurred.

> . . . . . . . . . .

> "One of the chief virtues of binding arbitration is that the entire grievance process is made more meaningful to the grievant, and therefore more useful. Where the ultimate arbiter of the dispute is a representative of one side of the dispute, adverse decisions will be hard to accept and the tendency toward alienation will be strong—witness the experience under the post office grievance procedure. Where the ultimate decision is made by a neutral third party, however, the grievant is much more likely to feel that he has had a fair hearing and the goal of harmonious relations will be best served. A 1963 study showed that employer-employee relations usually improved after adoption of grievance arbitration; most of the governmental units questioned recommended that other governmental units adopt such a procedure. The benefits arising from binding arbitration of grievances, and its legality or the ease with which it could be made legal, invite its adoption."

Note, Legality and Propriety of Agreements to Arbitrate Major and Minor Disputes in Public Employment, 54 Cornell L.Rev. 129, 135–36 (1968).

**10.** See note 3 supra.

engaged in their duties . . . ." Clearly the require-
ment of "just cause" for discipline does not infringe
upon this prerogative of the board, for violation of a val-
id regulation adopted by the board would surely be "just
cause" for discipline.[11] Thus, the power of the board to
adopt and enforce regulations is not impaired by the re-
quirement of "just cause" for discipline of a teacher.

The other statutory provision relied upon by the board,
section 514, empowers the board (subject to certain pro-
cedural requirements) "to remove any of its . . .
employees . . . for incompetency, intemperance,
neglect of duty, violation of any of the school laws of this
Commonwealth, or other improper conduct." [12] This

11. Indeed practice under industrial collective bargaining agree-
ments emphatically upholds the power of an employer to disci-
pline employees for disobedience of an order or regulation of the
employer.

"Under a collective agreement an employer may sometimes
properly impose discipline in circumstances which, were it an
employment contract, might result in his being liable to the
employee for damages. Consider, for example, the case in
which an employee is given a direction to perform certain
work. Suppose the order is improper, under his employment
contract, because the work is outside of his proper job bounda-
ries, because he has a contractual right to refuse overtime, or
for any other reason. By hypothesis the employee's refusal to
comply with the order cannot be made the basis for imposing a
contractual liability on him, since he broke no promise. If the
employee is discharged for his refusal, the employer is liable in
damages to the employee for breach of contract. The em-
ployee, of course, refuses to obey at his peril; his right to re-
cover depends on a later judicial determination as to whether
the order was improper. If the employment was governed by a
collective agreement the result is to the contrary. The under-
standing of the parties, and the almost universal ruling of arbi-
trators, is that an employee must obey an order so long as it
poses no threat to his personal safety and that discipline may
be imposed for failure to obey without regard to the propriety
of that order under the agreement."

Feller, supra note 6, at 778 (footnotes omitted).

We need not here consider whether, under this agreement, dis-
obedience of an improper order or regulation would constitute
"just cause" for discipline. There is no indication that such a
question is involved in this case. Moreover, that question is one
for the arbitrator to determine, at least in the first instance.

12. The dissent maintains that the relevant provisions of the Pub-
lic School Code are sections 1108 and 1122. See note 3 supra.

provision is the very antithesis of one entrusting the board with broad discretion to formulate and implement educational policy. The board is empowered to act only for reasons specified in the statute and its action is subject to judicial review. *Hutnik v. Duquesne School District*, 8 Pa.Cmwlth. 387, 302 A.2d 873 (1973); see Local Agency Law, Act of December 2, 1968, P.L. 1133, §§ 7, 8, 53 P.S. §§ 11307, 11308 (Supp.1974).

Moreover, the collective bargaining agreement is susceptible of at least two constructions which fully protect the authority of the board.[13] These stem from consideration of the procedure formerly in effect.

When a school board heretofore sought to dismiss a non-tenured teacher, the teacher was notified of the charges and afforded a hearing before the board, which

We conclude that, even if the dissent is correct on this point, it would not affect our analysis.

Section 1122 provides, in pertinent part:

"The only valid causes for termination of a contract heretofore or hereafter entered into with a professional employe shall be immorality, incompetency, intemperance, cruelty, persistent negligence, mental derangement, [and] persistent and wilful violation of the school laws of this Commonwealth on the part of the professional employe . . . ."

24 P.S. § 11–1122.

Section 1108 provides, inter alia, that "[n]o temporary professional employe shall be dismissed unless rated unsatisfactory . . . ."

24 P.S. § 11–1108. The provisions for rating non-tenured teachers are the same as those which must be used in determining competency of tenured teachers and are set out in section 1123 of the Code, 24 P.S. § 11–1123.

Assuming that these sections are relevant in a proceeding in which the board relies solely upon section 514, the only effect which this would have on our analysis would be the substitution of a slightly different statutory enumeration of permissible grounds for discharge for that contained in section 514.

13. There is no need for us to consider what is the proper construction of the agreement—whether one of those here suggested or some other. That is a question for the arbitrator, at least in the first instance. The injunction sought by the board could be granted only if it were clear that arbitration would be proscribed by section 703 of the PERA *regardless* of the construction adopted. Consequently, the existence of *any* construction which could properly be implemented is sufficient to require denial of the injunction.

then acted upon the proposed dismissal. As this Court stated in *Brentwood Borough School District Appeal,* 439 Pa. 256, 262–63, 267 A.2d 848, 851 (1970) ;

> "At the hearing the board plays a dual role. It acts as both prosecutor and as judge, and because of this it can never be totally unbiased."

The defects of this procedure from the standpoint of the teacher have long been evident. While there is an opportunity for judicial review of the discharge, it is limited to determining whether

> "the same is in violation of the constitutional rights of the appellant, or is not in accordance with law, or that the provisions of this act have been violated in the proceeding before the agency, or that any finding of fact made by the local agency and necessary to support its adjudication is not supported by substantial evidence."

Local Agency Law, supra, § 8, 53 P.S. § 11308. This type of review is, of course, no substitute for an impartial fact-finder in the first instance.

One possible construction of the collective bargaining agreement is that the "just cause" standard for discharge is identical with the statutory enumeration of reasons justifying such action. On this construction, all that the parties would have done is substitute a hearing before an impartial arbitrator for the hearing before the board and subsequent judicial review under the Local Agency Law.[14] From the standpoint of the parties, this would have the advantage of providing an inexpensive and expeditious procedure in addition to an impartial fact-finder.

An alternative construction is suggested by the brief for the union. It suggests that the term "just cause," as used in the agreement, contemplates the possibility of discharges for a wider variety of reasons than those enu-

14. There is no occasion in this case to consider the nature and scope of judicial review of the arbitrator's award.

merated in the statute.[15] Thus, an employee who elects [16] to pursue the grievance procedure rather than proceeding to a hearing before the board would accept a less restrictive substantive standard in return for the greater procedural advantages afforded by the arbitration proceeding.

We see no reason why either of the constructions here suggested would involve violation of any legal restriction upon the power of the board, and the board offers none.[17]

**15.** The brief quotes the language of the arbitrator in *Worthington Corp.*, 24 Lab.Arb. 1, 6–7 (1955):

" * * * '[i]t is common to include the right to suspend and discharge for 'just cause', 'justifiable cause', 'proper cause', 'obvious cause', or quite commonly simply for 'cause'. There is no significant difference between these various phrases. These exclude discharge for mere whim or caprice. They are obviously intended to include those things for which employees have traditionally been fired. They include the traditional causes of discharge in the particular trade or industry, the practices which develop in the day-to-day relations of management and labor and most recently they include the decisions of courts and arbitrators. They represent a growing body of 'common law' that may be regarded either as the latest development of the law of 'master and servant' or, perhaps, more properly as part of a new body of common law 'Management and labor under collective bargaining agreements.' They constitute the duties owed by employees to management, and, in their correlative aspect, are part of the rights of management."

**16.** Subsection 1c of the grievance procedure provides: "Nothing within this procedure shall be construed to deny to any employee his rights under any applicable law." Consequently, any construction which involves the application of a standard permitting discharges for causes other than those enumerated in section 514 would appear to present the employee with an election between the statutory remedy provided by section 514 and the Local Agency Law and the remedy provided by the grievance procedure in the agreement. We have no occasion to consider whether use of the grievance procedure rather than the statutory procedure would also be elective were the substantive standard the same.

**17.** Because neither of the constructions suggested here involves any restriction upon the substantive grounds for dismissal of a non-tenured teacher, we are unable to understand the dissent's contention that they would hamper the board in obtaining " 'the best educational facilities for the children of this Commonwealth.' " Post, at 47, quoting *Commonwealth ex rel. Hetrick v. Sunbury School Dist.*, 335 Pa. 6, 11, 6 A.2d 279, 281 (1939).

Consequently, we conclude that section 703 does not prohibit implementation of the provisions of the agreement challenged here.

This conclusion is bolstered by the fact that it is in agreement with the weight of authority in other jurisdictions. *Danville Board of School Directors v. Fifield,* 132 Vt. 271, 315 A.2d 473 (1974) (agreement not to discharge teacher except for "just and sufficient cause" and to arbitrate disputes as to the propriety of discharge specifically enforced); *Board of Education v. Associated Teachers,* 30 N.Y.2d 122, 131–132, 331 N.Y.S.2d 17, 24–25, 282 N.E.2d 109, 114–115 (1972) (Fuld, C. J., for a unanimous court [18]) (agreement not to discipline tenured teachers without "just cause" and to arbitrate disputes as to the propriety of discharge declared valid); *Local 1226, City Employees v. City of Rhinelander,* 35

Neither does either construction relieve the board of its "paramount . . . responsibility" to "employ competent and effective teachers . . . and . . . to discharge those it does not deem fit." Post, at 42, Obviously, no teacher will be discharged unless the board initially determines that one or more of the statutorily enumerated grounds for such action exist. All that either construction would do is provide an impartial determination of whether the board is correct in its belief that such grounds exist. Unless the power of the board to sit in judgment upon the charges preferred by it against a teacher is fundamental to the statutory scheme, neither construction is inconsistent with that scheme. No reason, other than nebulous appeals to the necessity of maintaining "the best and most efficient school system possible," post, at 47, is offered for believing that the General Assembly intended such a harsh and arbitrary result and we decline to attribute such a purpose to it.

It is true that under this contract "every decision of [the] school board to dismiss a non-tenured teacher . . . will become, if the teacher so elects [and the union concurs], subject to binding arbitration." Post, at 48. However, even in the absence of contracts of this sort, every decision to dismiss a non-tenured teacher is subject to an appeal to the judiciary under the Local Agency Law. No reason is offered for believing that binding arbitration is any more disruptive of the exercise of the board's responsibilities than such appeals. Indeed, given the greater speed and lower cost characteristic of arbitration proceedings, arbitration may be less disruptive than judicial appeals.

18. Three judges dissented on another point, but expressed their agreement with this aspect of the opinion of the court.

Wis.2d 209, 151 N.W.2d 30 (1967) (agreement to arbitrate dispute over discharge of city employee specifically enforced). Indeed, the sole authority for the board's contention here is what can only be described as dictum in *West Hartford Education Association v. DeCourcy*, 162 Conn. 566, 295 A.2d 526 (1972).

In *De Courcy*, the court was considering the scope of a school board's duty to bargain under the Connecticut Teacher Negotiations Act. In considering the propriety of arbitration, it was primarily concerned to distinguish between allowing the arbitrator to prescribe the terms of the agreement (which it found to be impermissible) and the arbitration of grievances regarding the interpretation of the agreement (which it held to be broadly permissible and a mandatory subject of negotiation between the parties). In the course of illustrating the proposition that the board could not delegate to an arbitrator discretion reposed in the board alone, it quoted from its decision in *Norwalk Teachers' Association v. Board of Education*, 138 Conn. 269, 280, 83 A.2d 482, 487 (1951): "For example, it could not commit to an arbitrator the decision of a proceeding to discharge a teacher for cause." It is noteworthy that *Norwalk Teachers' Association* was decided prior to the enactment of any statute authorizing collective bargaining by Connecticut teachers and the *De Courcy* court failed to consider whether the enactment of such a statute affected the continuing validity of the quoted statement. Even if this dictum does establish the proposition as the law of Connecticut, it appears to us to rest on a conception of collective bargaining which is narrower than that embodied in the Public Employee Relations Act. It is therefore not persuasive on the issue before us.

Motion to quash denied. Decree affirmed. Each party pay own costs.

EAGEN, J., dissents.

POMEROY, J., filed a dissenting opinion.

JONES, C. J., did not participate in the consideration or decision of this case.

POMEROY, Justice (dissenting).

The Court's decision today permits school boards in Pennsylvania to abdicate one of their most essential prerogatives and duties, namely the discharge for cause of a teacher. The result disserves the cause of quality public school education in the Commonwealth. Because I am convinced that the Court's holding is without statutory foundation, I must respectfully dissent.

Purportedly acting pursuant to the authority granted by § 514 of the Public School Code,[1] the appellant Board of Education (the Board) on July 8, 1974, suspended from his position at the Crispin School one Edgar Vahey, a non-tenured teacher, "pending the Board's action for [his] dismissal." The suspension was without pay and effective June 30, 1974. Vahey was advised that he was entitled to request a hearing before a committee of the Board.[2] On September 9, 1974, the Philadelphia Federation of Teachers, appellee herein, by its attorney, presented to the American Arbitration Association a demand for arbitration, asserting that the Board's suspension of Vahey had been improper. This action to enjoin arbitration was then initiated by the Board. Holding that no cause of action was stated, the court of common pleas sustained the preliminary objections filed by the

1. "The board of school directors in any school district, except as herein otherwise provided, shall after due notice, giving the reasons therefor, and after hearing if demanded, have the right at any time to remove any of its officers, employes, or appointees for incompetency, intemperance, neglect of duty, violation of any of the school laws of this Commonwealth, or other improper conduct." Act of March 10, 1949, P.L. 30, art. V, § 514, 24 P.S. § 5-514 (1962). As shown later in this opinion, this section has been construed not to apply to temporary professional employees, including non-tenured teachers. See text, infra at p. 44 [typed copy].

2. See § 514, ibid. Whether such a hearing was requested is not disclosed by the record before us.

Federation and directed arbitration to proceed. The Board brought this appeal.

The record before us is necessarily scanty; it does not indicate the reason for the suspension (and projected ultimate dismissal) of Vahey by the Board, nor the reasons why the union considered that action to be improper. Presumably those factual matters will be explored in whatever hearing hereafter ensues. The question for decision instantly is whether such hearing will be conducted by the Board, as it contends should be the case, or, as the Federation urges, by arbitrators chosen pursuant to the collective bargaining agreement between the parties entered into on March 1, 1973.

Under the agreement a "grievance" is subject to binding arbitration. A grievance is defined to include a complaint that there has been "improper application of any provision" of the agreement. [Art. B–VIII, sec. 1(a)]. Article T–III, section 9(f) of the agreement provides:

"A teacher or other employee who does not have tenure shall not be subjected to discipline or discharge without just cause."

Since the union has asserted a grievance in charging that the "just cause" provision has been improperly applied, it argues that determination of the existence of "just cause" in Mr. Vahey's case is a subject of arbitration. It reinforces its argument by pointing to the provision of the Public Employe Relations Act [3] (Act 195) (the statute under which the collective bargaining agreement was negotiated), that

"arbitration of disputes or grievances arising out of the interpretation of the provisions of a collective bargaining agreement is mandatory." Act 195, § 903.

As the approach of the Court reveals, the key to the resolution of the narrow issue before us is § 703 of Act

**3.** Act of July 23, 1970, P.L. 563, No. 195, art. IX, § 903, 43 P.S. § 1101, 903 (Supp. 1974).

195, *supra*, but I emphatically disagree that the section sanctions the result to which the court has come. Section 703 provides:

"The parties to the collective bargaining process shall not effect or implement a provision in a collective bargaining agreement if the implementation of that provision would be *in violation of, or inconsistent with, or in conflict with* any statute or statutes enacted by the General Assembly of the Commonwealth of Pennsylvania or the provisions of municipal home rule charters." (Emphasis supplied).

The Court's present misconstruction of the prohibition contained in this section finds its antecedent in *Pennsylvania Labor Relations Board v. State College Area School District*, 461 Pa. 494, 509, 337 A.2d 262, 269 (1975). A majority of the Court [4] there construed § 703 as providing that an item is improperly included in a collective bargaining agreement only if it is *in violation of* existing law. The Court's opinion in that case stated:

"Section 703 merely prevents a term of a collective bargaining agreement from being in violation of existing law."

\* \* \* \* \* \* \* \*

"We therefore conclude that items . . . are only excluded under section 703 where other applicable statutory provisions explicitly and definitively prohibit the employer from making an agreement as to that specific term or condition of employment." 461 Pa. at 510, 337 A.2d at 269, 270.

I expressed the view in *State College* that such a construction ignores the plain and unambiguous language of § 703. I adhere to that opinion. The phrases "inconsistent with" and "in conflict with" in that section of Act 195 are obviously not synonymous with "in violation of" and there is no basis for assuming that the legislature's

4. A concurring opinion was filed by this writer, joined by Mr. Chief Justice Jones. Mr. Justice Eagen filed a dissenting opinion.

explicit use of such terms amounted to mere surplusage. *State College, supra* at 513, 337 A.2d at 271, n. 1 (concurring opinion). Thus, although Article T–III, section 9(f) of the collective bargaining agreement may not be "in violation of" the School Code, that is not an end of the matter; the question remains whether that provision of the agreement and the consequence of binding arbitration which it entails is inconsistent with or in conflict with the statutory scheme contained in the Public School Code [5] (The Code). An analysis of the Code satisfies me that inconsistency and conflict are indeed present.

Article XI of the Code constitutes a comprehensive scheme designed to regulate the relationship between a school district and its teachers. Teachers are divided into three classifications, defined in § 1101. These are (1) professional employes, (2) temporary professional employes and (3) substitutes.[6]

The temporary professional employee (whose rights and status are specifically delineated in § 1108 of the Code) is distinguishable from the professional employee by a sole but significant factor, i. e., the lack of tenure

5. Act of March 10, 1949, P.L. 30, art. I, § 101 et seq., 24 P.S. § 1–101 et seq. (1962).

6. "§ 11–1101. Definitions.
 As used in this article,
 (1) The term 'professional employe' shall include those who are certified as teachers, supervisors, supervising principals, principals, directors of vocational education, dental hygienists, visiting teachers, home and school visitors, school counselors, school secretaries the selection of whom is on the basis of merit as determined by eligibility lists and school nurses.
 (2) The term 'substitute' shall mean any individual who has been employed to perform the duties of a regular professional employe during such period of time as the regular professional employe is absent on sabbatical leave or for other legal cause authorized and approved by the board of school directors or to perform the duties of a temporary professional employe who is absent.
 (3) The term 'temporary professional employe' shall mean any individual who has been employed to perform, for a limited time, the duties of a newly created position or of a regular professional employe whose service has been terminated by death, resignation, suspension or removal."

status. See *Travis v. Teter*, 370 Pa. 326, 330, 87 A.2d 177, 179 (1952); *Johnson v. United School District Joint School Board*, 201 Pa.Super, 375, 191 A.2d 897 (1963) (allocatur denied).[7] Among the benefits which accompany the acquisition of tenure are the procedural safeguards which attend any tenured teacher whom the board seeks to dismiss (see § 1129–32). There are no corresponding provisions which pertain to the dismissal of non-tenured teachers, see *Nicolella v. Trinity Area School District School Board*, 444 Pa. 544, 281 A.2d 832 (1971); but since 1971 school board action in such a case is considered an adjudication under the Local Agency Law, Act of December 2, 1968, P.L. 1133, 53 P.S. § 11301 et seq., and the teacher is entitled to full procedural due process thereunder. See *Smethport Area School District v. Bowers*, 219 Pa.Super. 269, 280 A.2d 632 (1971). See also *Smethport Area School District v. Bowers*, 440 Pa. 310, 269 A.2d 712 (1970).

The power of the school board to dismiss a temporary professional employee is granted explicitly in § 1108 and implicitly in § 1122 of the Code (and not in § 514, as the parties to this appeal have assumed) [8] *Nicolella v. Trinity Area School District School Board*, 444 Pa. 544, 550,

7. "Section 11–1108. Temporary Professional Employes (d) Temporary professional employes shall for all purposes, except tenure status, be viewed in law as full-time employes, and shall enjoy all the rights and privileges of regular full-time employes." Pursuant to § 1108 of the Code, the non-tenured teacher or "temporary professional employe" is employed for what is, in essence, a probationary period of two years. At least twice yearly the county or district superintendent is required to rate such a teacher's performance, according to the procedure set forth in § 1123. See *Mullen v. DuBois Area School District*, 436 Pa. 211, 258 A.2d 877 (1969). After two consecutive years of satisfactory performance and upon a satisfactory rating during the last four months of the probationary period, the non-tenured teacher gains the status of a "professional employe", i. e., he acquires tenure and is entitled to a professional employe's contract. (See § 1121).

8. Even were § 514 of the Code, see n. 1, *supra*, the operative section governing discharge of temporary professional employees, it would not change the views expressed herein.

281 A.2d 832, 835 (1971); *Johnson v. United School District Joint School Board*, 201 Pa.Super. 375, 191 A.2d 897 (1963) (allocatur denied).[9] The grounds for dismissal are not only incompetency (the only ground specifically mentioned in § 1108) but also the several other grounds enumerated in § 1122 for termination of a contract with a tenured teacher. *Johnson v. United School District Joint School Board, supra.* The grounds are immorality, intemperance, cruelty, persistent negligence, mental derangement, and persistent and wilful violation of the school laws of this Commonwealth (section 1122).

This being, in brief compass, the statutory scheme, procedural and substantive, pertaining to the discharge of non-tenured teachers, it is clear to me that the collective bargaining agreement provision here in issue is in conflict with it. As we said in *Commonwealth ex rel. Hetrick v. Sunbury School District*, 335 Pa. 6, 11, 6 A.2d 279, 281 (1939):

"The fundamental policy of our public school system is to obtain the best educational facilities for the children of this Commonwealth. . . . The duty of devising methods by which this important obligation can be discharged devolves upon the school boards."

To this end, the legislature has entrusted school boards with the power and the duty to employ competent, effective teachers, *ibid*, and, *a fortiori*, the correlative power and duty to discharge those it does not deem to be fit.

---

**9.** In holding the grounds for discharge in § 1122 applicable to temporary professional employees as well as to professional employees, the Superior Court reasoned:

"It appears to us that a temporary professional employe may be dismissed either by an unsatisfactory rating referred to in §§ 1108 and 1123 . . . or by the board for reasons set forth in § 1122. If a professional employe can be discharged under § 1122 and a temporary professional employe cannot be discharged under that section, the teacher who has not acquired tenure by two years service has greater rights than one who has acquired tenure status. This could not have been the intent of the legislature." 201 Pa.Super. at 383, 191 A.2d at 902.

Concededly, this power cannot be wielded capriciously, and the clear purpose of § 1122 of the Code was to insure that competent and dedicated teachers would not be the targets of arbitrary board action. *Streibart v. Board of Directors of the School District of the City of York,* 339 Pa. 119, 14 A.2d 303 (1940).[10] But to say that a board may not act arbitrarily does not, of course, relieve it of its fundamental power and duty to maintain the best and most efficient school system possible. See *Appeal of Houtz,* 361 Pa. 537, 65 A.2d 420 (1949). In this light, the inclusion of article T–III, section 9(f) in the collective bargaining agreement before us amounted to a delegation of a paramount board responsibility which, if not in violation of the School Code, is at least wholly inconsistent with the statutory scheme which the Code embodies.

The Court recognizes that the General Assembly intended that a school board should have broad discretionary powers in the area of teacher employment, but concludes that this collective bargaining agreement can be construed in such a manner as to "fully protect the authority of the board." (Opinion of the Court, ante at 47

10. The majority opinion quotes from *Brentwood Borough School District Appeal,* 439 Pa. 256, 267 A.2d 848 (1970) to the effect that at a dismissal hearing the board plays a dual role, acting both as prosecutor and as judge, and hence can never be totally unbiased. 439 Pa. at 262–63, 267 A.2d 848. This perhaps overly-broad statement was not intended, at least to my mind, to impugn all board hearings where teacher dismissal is involved. Indeed, I subscribe to Mr. Justice Roberts' comment dissenting in *Brentwood Borough,* to the effect that we should expect a school board to offer its professional employees "a truly fair hearing" notwithstanding its dual role. As Mr. Justice Roberts went on to say, "almost every administrative agency in this Commonwealth acts at some time or another as 'both prosecutor and judge' in the course of its proceedings; and they are all nonetheless required to conduct their proceedings in accordance with certain minimum standards of fairness . . . [it is not] too much to ask of a public agency like a school board that it restrain its prosecutorial zeal and provide at least a modicum of procedural fairness to every citizen who appears before it." 439 Pa. at 265, 267 A.2d at 852.

[typed copy]). With respect, I think this is an impossibility. As an illustration, consider the following provision of § 508 of the School Code:

"The affirmative vote of a majority of all the members of the board of school directors . . . duly recorded, showing how each member voted, shall be required in order to take action on the following subjects:

\* \* \* \* \* \* \* \*

Dismissing a teacher after a hearing.[11]

\* \* \* \* \* \* \* \*

The emasculation of the appellant Board's ultimate authority to discharge a non-tenured teacher which will result from the submission of the issue to arbitration is obvious. If the arbitrators should determine that the basis for the Board's decision to dismiss constitutes "just cause", the taking of the § 508 roll call by the Board will amount merely to the performance of a perfunctory ministerial duty—a meaningless echoing of a decision made for the Board by the arbitrators. Surely this sort of charade would not comport with the reasoned decision-making by each individual Board member which the legislature intended by § 508. Conversely, if after a hearing the Board, by affirmative majority vote of its members duly recorded in accordance with § 508, were to dismiss a temporary professional employee for one of the § 1122 causes, the union could, under the contract, even at that late point (a point which had not been reached in the case at bar) assert as a grievance that there was no "just cause" for the dismissal. The action of the Board would then have been an exercise in futility, for the en-

11. In *Mullen v. DuBois Area School District*, 436 Pa. 211, 259 A. 2d 877 (1969) this Court held that the requirement in § 508 that the vote of each member be formally recorded in order that board action be valid is directory rather than mandatory. This holding in no way affected, however, our recognition that a majority vote is essential to the validity of any of the actions enumerated in § 508.

tire case would then be referred to arbitrators; the arbitrators would sit, in effect, as a super school board in a matter of teacher discipline and dismissal, but not subject to the provisions of the School Code governing the actions of school boards, and not subject to appeal.[12]

To recapitulate, the presence of clause T–III, section 9(f), or a clause like it, in a collective bargaining agreement means that every decision of a school board to dismiss a non-tenured teacher because of incompetency, immorality, intemperance, cruelty, etc. (see § 1122 of the Code, *supra*) will become, if the teacher so elects, subject to binding arbitration. I cannot accept that this abdication of responsibility was intended by the legislature or is consonant with the policy and provisions of the Public Employe Relations Act as it applies to the public schools.

I would reverse the order of the court of common pleas and allow the appellant Board to proceed with its hearing and determination as to the propriety of Mr. Vahey's dismissal.

---

**12.** To suggest, as does the majority (opinion of the Court, ante at 41–42 [typed copy]), that the procedural safeguards which are afforded the non-tenured teacher under the Code and the Local Agency Law are less than might be desired by the teacher is to miss the point. The issue before us is not *why* the Federation would prefer that matters of teacher dismissal be submitted to binding arbitration; the question is whether this may be done consistently with the legislative scheme. For this same reason, it is irrelevant that the union is willing ". . . to accept a less restrictive substantive standard [than the conduct set forth in § 1122 or § 514] in return for the greater procedural advantages afforded by the arbitration proceeding." (Majority opinion ante at 42 [typed copy]). On the other hand, there is nothing in the contract or in logic to prevent arbitrators in a particular dispute from giving "just cause" a construction which is narrower than the statutory enumeration of causes for dismissal. Were they to do so, the purpose of the Code would be thwarted.

As excellent a device as arbitration is in many aspects of labor relations, substitution of it for the deliberate, responsible recorded action of a majority of a school board, taken pursuant to § 508 of the Public School Code, is in my view in clear conflict with the legislative intent.