## Allegrucci v. Wyoming Area School District

*James A. Kelly,* Joseph A. Lack, for appellants.
*Joseph J. Carmoody,* for appellee.

TOOLE, *J.,* October 24, 1983 — The procedural posture of the instant matter is as follows:

On June 28, 1982, the Board of School Directors of the Wyoming Area School District, hereafter re-

ferred to as the board, adopted a series of resolutions the purpose of which was to demote the above named individuals in both position and salary from their respective employment as Administrators to teachers. The Public School Code of 1949, hereafter referred to as the School Code[1] sets forth the procedure which shall be employed in the demotion of any professional employe.[2] Specifically, the School Code provides:

"There shall be no demotion of any professional employe either in salary or in type of position . . . without the consent of the employe, or, if such consent is not received, then such demotion shall be subject to the right to a hearing before the board of school directors and an appeal in the same manner as hereinbefore provided in the case of the dismissal of a professional employe."[3]

Appellant administrators refused to consent to the action by the board. A hearing was scheduled and held on July 27, 1982, at 7:00 p.m. in the auditorium of Wyoming Area High school. All appellants were present and represented by counsel. A certified transcript of that hearing was filed on November 4, 1982.

The action taken by the board on June 28, 1982, will be considered and examined in the context of the statutory framework of the Public Employee Relations Act (PERA) commonly referred to as Act 195, and a contract entered into pursuant to that act

---

1. Act of March 10, 1949, P.L. 30, as amended, 24 P.S. §1-101 et seq.

2. 24 P.S. §11-1101(1).

3. 24 P.S. 11-1151, as amended 1963, Aug. 8, P.L. 564, §10. The due process requirements are delineated in 24 P.S. §11-1127.

and executed by and between the board and the administrative staff in May of 1980.[4]

Our scope of review is dictated by 2 Pa. C.S. §754 (b), which pertinently states:

(b) Complete record — In the event a full and complete record of the proceedings before the local agency was made, the Court shall hear the appeal without a jury on the record certified by the agency. After hearing the court shall affirm the adjudication unless it shall find that the adjudication is in violation of the constitutional rights of the appellant, or is not in accordance with law, or that the provisions of subchapter B of Chapter 5 (relating to practice and procedure of local agencies) have been violated in the proceedings before the agency, or that any finding of fact made by the agency and necessary to support its adjudication is not supported by substantial evidence. . . .

In addition, our analysis will focus on the terms of the contract construed in light of PERA and the applicable case law interpreting that act.

Initially, we will examine the statutory framework which provides the legal construction from which this agreement was forged. The right of public employes[5] to bargain collectively over matters which are subject to bargaining is set forth in §701 of PERA.[6] Those matters over which public employers

---

4. The contract was entered into evidence and marked as joint administrator's No. 1-2, a copy of which is attached to the notes of testimony.

5. See 43 P.S. §1101.301(2).

6. 43 P.S. §1101.701 provides: "Collective bargaining is the performance of the mutual obligation of the public employer and the representative of the public employes to meet at reasonable times and confer in good faith with respect to wages, hours and other terms and conditions of employment, or the negotiation of an agreement or any question arising

are not required to bargain are set forth in §702 of PERA.[7] Appellants, although public employes, occupy a hybrid position in the statutory scheme, that of a professional employe,[8] and First Level Supervisor.[9] There is no contention that the demoted administrators were anything but first level supervisors and as such are not permitted to be included with any other units of public employes but are permitted to form their own separate homogenous units.[10] Sec. 704 of the act further provides:

"Public employers shall *not be required to bargain* with units of first level supervisors or their representatives but shall be required to meet and discuss[11] with first level supervisors or their representatives, on matters deemed to be bargainable for other public employes covered by the Act." (Emphasis supplied.)

The contract (Joint Administrators Exhibit No. 1-4) in question was entered into between the Profes-

---

thereunder and the execution of a written contract incorporating any agreement reached but such obligation does not compel either party to agree to a proposal or require the making of a concession."

7. 43 P.S. §1101.702 provides: "Public employers shall not be required to bargain over matters of inherent managerial policy, which shall include but shall not be limited to such areas of discretion or policy as the functions and programs of the public employer, standards of service, its overall budget, utilization of technology, the organizational structure and selection and direction of personnel. Public employers, however, shall be required to meet and discuss on policy matters affecting wages, hours and terms and conditions of employment, as well as the impact thereon, upon request by public employe representatives."

8. 43 P.S. §1101.301(7).

9. 43 P.S. §1101.301(6), (19).

10. 43 P.S. §1101.605(5).

11. 43 P.S. §1101.301(17).

sional Administrative Staff of the Wyoming Area School District and the Board of Education of the Wyoming Area School District. It is comprised of nine Articles.

Article I provides that the term of this agreement shall begin on July 1, 1980, and shall continue in full force and effect until June 30, 1984. Article II is captioned "Salary Schedule". Twelve administrative positions, including those of appellants, are listed below the heading "Title". Directly opposite each position is the stated percentage of increase over the previous year's gross salary. Percentage increases are identical for all the enumerated positions and fall under the heading "Fiscal Year—Percent of Increase". The fiscal years set forth coincide with the term of the contract.

Article VIII is entitled "Other Benefits" and provides that "the Administrative Staff shall receive all other benefits, not inconsistent with the provisions of this agreement as contained in the collective bargaining Agreement between the Board of Education of the Wyoming Area School District and the Wyoming Area Education Association executed January 22, 1980". The contract then provides in laundry list fashion seven specific items.

Article IX captioned "School Board Responsibility" states in part:

The determination and administration of school policy, the operation of the schools, and the direction of the employees are vested exclusively in the School Board.

The agreement is signed by 12 individuals. Each signatory's name appears directly above his or her position.

Gene J. Allegrucci — Principal of Child Accounting

Lawrence C. Brogna — Assistant Middle School Principal

Carl B. Rosencrance — Asst. Senior High School Prin.

Dr. Doris E. Wyllie — Principal of Pupil Personnel

Our resolution of the instant matter will initially require an examination and analysis of the legal labyrinth known as the School Code of 1949.

In addition and as a separate and independent basis for our decision, we will subsequently consider the rights and responsibilities which flow from the contractual obligations and mandates of the Public Employe Relations Act.

Counsel for appellants devote a major portion of their brief addressing the issues of "demotion" and "realignment" as those terms are understood under the School Code of 1949.

It is crucial from the outset of the analysis regarding these statutory terms to understand that they are separately defined and distinct concepts from which emigrate separate and distinct rights and obligations.

The relevant portion of the law concerning "demotion" has been previously set forth.

"Realignment" is defined at 24 P.S. §1125.1(c) as follows:

(c) A school entity shall realign its professional staff so as to insure that more senior employes are provided with the opportunity to fill positions for which they are certified and which are being filled by less senior employes.

Four recent decisions by the Commonwealth Court illuminate the purpose, significance and relationship between the above cited sections of the School Code.

In Nagy v. Belle Vernon Area School District, 49 Pa. Commw. 452, 412 A.2d 172 (1980), the court was called upon to review an action by a school district which abolished the petitioner's non-mandated position of Director of Elementary Education and returned him to classroom teaching, a situation not dissimilar to the matter at bar. The board in Nagy, as does the board in the instant case, acknowledged that its action in returning petitioner to a teaching position was a demotion. Informing petitioner of its decision, the board indicated that the position was being abolished "for reasons of economy and for a better structural arrangement in the district", again reasons which are not dissimilar to those advanced by the school district in the matter sub judice.

In Nagy, the court pertinently stated, 412 A.2d 172 at 175:

"At a hearing, on the demotion of a professional employee, 'two questions are before the Board: (1) whether or not the professional employee has been demoted . . . and, (2) in the event the professional employee has been demoted, the reason for such demotion must be clear and apparent'. Smith v. Darby School District, 338 Pa. 301, 130 A.2d 661, 671 (1957).

Also, in Lucostic v. Brownsville Area School District, 6 Pa. Cmwlth. 587, 297 A.2d 516 (1972), as to cases such as these, we listed these principles: '(1) A board of School Directors may demote a professional employe in position or salary or both without his or her consent. (Tassone v. Redstone Township School District, 408 Pa. 290, 183 A.2d 536 (1962)); (2) The action of the Board in such case is presumptively valid (Hibbs v. Arensberg, 276 Pa. 24, 119 A.2d 727 (1923)); and (3) The demoted employe contesting the Board's action has the burden of proving it to be arbitrary, discriminatory or founded

upon improper considerations (Smith v. Darby School District, 388 Pa. 301, 130 A.2d 661 (1957); Lakeland Joint School District v. Gilvary, 3 Pa. Cmwlth. 415, 283 A.2d 500 (1971). Lucastic, supra, 6 Pa. Cmwlth. at 590-91, 297 A.2d at 518.'

The burden was thus on petitioner to establish that his demotion was arbitrary, discriminatory or founded upon improper considerations."

The court also states: "Importantly we note that petitioner has made no allegation that the board's actions, in eliminating one position and creating another, amounted to a sham or subterfuge to demote petitioner without cause."

In Shestack v. General Braddock Area School District, 63 Pa. Commw. 204, 437 A.2d 1059 (1981), the court was called upon to examine the interrelationship between the above cited sections. The factual and legal context of Shestack resembles that at bar.

David Shestack, a professional employe, was demoted from his position as the principal of an elementary school to that of a fifth grade classroom teacher when, in June, 1980, a decline in pupil enrollment caused the board of school directors to close an elementary school in the district and to transfer the principal of that school to the position previously held by Shestack. At the hearing conducted by the board, Shestack adduced evidence to that effect, and the board found that although no elementary principals were less senior than he, one elementary principal was also certified as an administrator at the junior high school, where there was employed a principal and an assistant principal, less senior than both Shestack and a duly certified elementary principal. Shestack then argued that the action with respect to his position of employment constituted a "realignment" within the meaning of

the School Code and that this statutory provision required School Directors to realign a professional staff in strict conformity with the relative seniority of the staff members realigned. He argued that the statutory requirement had not been met because the board did not transfer the duly certified elementary principal to the position of the less senior-junior high school principal so that Shestack might be retained in his position as the principal of an elementary school. The board argued that §1125.1(c) was inapplicable to the demotion and that the only issue before the court was the propriety of the demotion under §1151 of the School Code. They further contended, relying on Nagy, that the demotion was proper because Shestack had failed to establish that the action of the board was arbitrary, discriminatory, or based on improper motives.

The court held that Shestack should have been permitted to challenge his transfer to a classroom teaching position not only as an improper demotion under §1151, but as an improper realignment under §1125.1(c). The essential holding of Shestack is that §1151 is not an exclusive path to relief. The instant case, however, does not run afoul of the teachings of Shestack. Appellants advance both sections as appropriate avenues of relief, both were considered by the board and both are presently before this court.

In their brief, counsel for appellants state, "The foregoing Shestach (sic) decision reverses prior case law. . . . The Shestach case demonstrates a new threshold in cases such as the one presented by the instant apeal. Accordingly, the prior law as announced by our Courts (Citations omitted) no longer applies. As a result, the appellants herein are relieved of the previous burden of exposing arbitrary and capricious conduct by the School Board" (ap-

pellant's brief, p. 9). We flatly reject counsel's interpretation of that opinion. Shestack stands for the proposition that §1125.1(c) may be an additional and appropriate vehicle for relief under the same circumstances which may constitute a demotion. The pertinent considerations under each section are distinct. We direct appellant's attention to Chester Upland School District v. Brown, 67 Pa. Commw. 540, 447 A.2d 1068 (1982), a decision subsequent in time to Shestack. In Brown, the school district had demoted two professional employees, this demotion was ultimately appealed to the Commonwealth Court. The district had notified the employes in June of 1980 that their positions as Middle-school Vice-Principals were to be eliminated as a result of declining enrollment, economic conditions and realignment of the administrative staff. In addressing the standard of review, the court states, (447 A.2d 1068 at 1069):

Our scope of review is to determine whether or not an error of law was committed, constitutional rights were violated, or necessary findings of fact are unsupported by substantial evidence (citations omitted). *Demoted employees contesting the board's action have the burden of proving it to be arbitrary, discriminatory or founded upon improper considerations.*" (Citations omitted) (Emphasis supplied.)

Examining the appropriateness of the "demotion" in the instant case under the aforementioned standard, we have no hesitancy in concluding that appellants have failed to meet their required burden. The board has demonstrated to the court's satisfaction that the action taken was warranted and based on permissive considerations.

As we have previously stated, the issue of "realignment" contemplates a different analysis, one focused primarily on seniority. A cursory read-

ing of the relevant section lends support to the argument advanced by Appellants, but the court's decision in Godfrey v. Penns Valley Area School District, 68 Pa. Commw. 166, 449 A.2d 765 (1982) suggests that seniority is not the sole criteria in realignment of a professional staff. In Godfrey, the Commonwealth Court adopted in toto the opinion of Centre County President Judge Brown. The court framed the issue as follows (449 A.2d 765 at 767):

The issue for our determination [is] whether 24 P.S. §11-1125.1(c) mandates that the school district realign its staff across lines of multiple certification to insure the continued employment of the most senior employees of the district, regardless of whether or not such realignment is, in the opinion of the Board of Directors of the School District and the school administrators, educationally unsound.

While Godfrey involved the suspension of a teacher as a result of realignment, Shestack mandates that the identical legal principles should apply in the case of an administrator, who, as the result of a realignment, is demoted from that position to a teaching position.

Godfrey clearly states the propriety of considering the practical impact of realignment on the educational process and especially across multiple lines of certification. In doing so, the court expressly rejects appellants' argument that the recent amendments to the school code require realignment of a professional staff whenever such realignment would result in a more senior member of the professional staff being retained. The court concludes its opinion stating:

". . . even if the amendments resulting from Act 97 are interpreted by our Courts to require realignment of other members of the professional staff to insure that the least senior member of the

staff is suspended, the practicality of such realignment and its effect on the educational processes within the School District must be considered."

The instant record is replete with the district's emphasis on building level experience, continuity, and seniority as factors which were considered before taking the action under consideration. We hold that the board adequately considered appellants' seniority along with the additional enumerated factors articulated in the Godfrey decision in realigning the professional staff.

Turning to the agreement, we note that the board advances several arguments in an attempt to extricate itself from the contract. It argues, "as indicated in the cross examination of Mr. Olesky by Attorney Kelly, the Teacher's Association had a full employment clause in their contract whereby the board would employ 162 teachers or pay the staff, if under that number, the same amount of money. The administrator's contract contained no such provision and nowhere in the agreement is it indicated that there was a guarantee either that the positions would be filled for the duration of the agreement or that it included a full employment clause similar to that in the teacher's contract".

The so-called full employment clause contained in the teachers' contract was discussed during the testimony. In explaining the nature and purpose of this clause, Mr. Olesky states, "The District has a contract with the teachers which states that we would have 162 professional employees on the teaching staff and any number of professional employees under that amount of 162 would not change the amount of money to be distributed to the teachers".

Later in the record, Mr. Olesky goes on to indicate:

In the teachers contract, there is a clause that states that the District shall maintain the professional employees and the membership of the teachers—understood to be classroom teachers—at 162. If, for some reason or other, the Board did not rehire if someone retired, did not place someone in there, then the same amount of money would be in there for the 161 teachers that was in there for the 162 teachers.

It is apparent from Mr. Olesky's explanation that this clause is euphamistically termed. The clause's effect has little or nothing to do with full employment of individual teachers. Rather, this provision provides a mechanism by which the natural attrition of individual teachers inures to the economic benefit of the remainder. This court is hard pressed to understand how the lack of such a clause in the administrator's contract indicates that the board may abolish the administrative positions. We are of the opinion that the argument advanced by the board may be appropriate if, for example, the administrators were contending that the salary of one of their fellow administrators who was no longer with the district should inure to their collective benefit. But this is simply not the case.

We are also unpersuaded by the board's contention that the positions in question were not guaranteed for the duration of the agreement. The guarantee of continued employment in an administrative capacity and at a particular rate of compensation is the contract itself. This instrument, freely entered into and negotiated, provided these administrators with that legal assurance.

It is further argued that Article IX of the agreement reserves unto the board the exclusive right to

determine the "direction" of the Administrators. Additionally, the court's attention is directed to §702 of PERA which, as stated above, declares that "Public employers *shall not be required* to bargain over matters of inherent managerial policy, which shall include . . . the organizational structure and selection and direction of personnel". (Emphasis supplied.) The plain meaning and import of the statute is simply that a public employer is under no legal obligation to negotiate over matters enumerated in §702. If, however, during negotiations a public employer chooses to employ such a matter as a bargaining chip, they will not be heard later to complain. "Direction", as that word appears in the context of Article IX, cannot be construed to allow the Board to ignore the very terms which form the essence of the contract. We would also note that Sec. 703 of PERA states:

The parties to the collective bargaining process shall not effect or implement a provision in a collective bargaining agreement if the implementation of that provision would be in violation of, or inconsistent with, or in conflict with any statute or statutes enacted by the General Assembly of the Commonwealth of Pennsylvania or the provisions of municipal homes rule charters.

In interpreting this provision, our Supreme Court has held:

The mere fact that a particular subject matter may be covered by legislation does not remove it from collective bargaining under §701 if it bears on the question of wages, hours and conditions of employment. We believe that §703 only prevents the agreement to and implementation of any term which would be in violation of or inconsistent with any statutory directive. Board of Education of Phila-

delphia v. Philadelphia Federation of Teachers, 464 Pa. 92 at 97, 346 A.2d 35 at 38 (1975).[12]

To reiterate, our holding today turns exclusively on the contract entered into between the parties and the applicable provisions and decisional law interpreting the Public Employe Relations Act. We would note, however, that but for the contract the court would be inclined to rule in favor of the school district. Our analysis of demotion/realignment is exclusive and independent of our contractual analysis. We have addressed the issue of demotion/realignment because of the apparent confusion regarding those concepts and because of the energy expended at the hearing before the board and in counsel's briefs discussing these issues.

## ORDER

The appeal of Gene J. Allegrucci, Lawrence C. Brogna, Carl B. Rosencrance, and Dr. Doris E. Wyllie is sustained, and the decision of the Board of Directors of Wyoming Area School District is reversed and the matter is remanded to the board of directors with directions to proceed in accordance with the within opinion.

---

12. For additional cases delineating the scope of a School Board's authority and discretion in negotiations, see Pennsylvania State Education Assoc. et al. v. Baldwin Whitehall School District, 30 Pa. Commw. 149, 372 A.2d 960 (1977); Allegheny Valley School District v. Allegheny Valley Educational Association, 25 Pa. Commw. 559, 360 A.2d 762 (1976); Cumberland Valley Educational Association v. Cumberland Valley School District, 24 Pa. Commw. 167, 354 A.2d 265 (1976); Dauphin County Technical School Education Association v. Dauphin County Area Vocational-Technical School Board, 24 Pa. Commw. 639, 357 A.2d 721 (1976).