391 A.2d 1318

**PITTSBURGH JOINT COLLECTIVE BARGAINING COMMITTEE, Appellant,**

v.

**CITY OF PITTSBURGH, Pete Flaherty, Mayor, and Bruce Campbell, Executive Secretary.**

Supreme Court of Pennsylvania.

Argued March 7, 1977.

Decided Oct. 6, 1978.

Ernest B. Orsatti, Jubelirer, McKay, Pass & Intrieri, Pittsburgh, for appellant.

D. R. Pellegrini, Asst. City Sol., Pittsburgh, for appellee.

Richard Kirschner, Philadelphia, for intervenor.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION

NIX, Justice.

The parties to this appeal, the Pittsburgh Joint Collective Bargaining Committee and the City of Pittsburgh, entered into a collective bargaining agreement dated July 25, 1973 which was in full force and effect until December 31, 1975.[1]

■ On August 21, 1973 Frank Parsons, a member of appellant union, was suspended for five days, subject to discharge. On that same day, Mr. Parsons filed a grievance for unjust suspension and, subsequent to his discharge from the Department of Parks and Recreation of the City of Pittsburgh on August 28, 1975, filed a grievance with respect to his discharge. Appellant union, after duly exhausting all steps in the contractual grievance procedure[2] requested that the City submit the dispute to binding arbitration.[3] Upon the City's refusal to arbitrate the dispute, the

1. Pertinent parts of the agreement will be found in the footnotes to this opinion.

2. "SECTION 5—GRIEVANCE PROCEDURE

A. The purpose of this section is: (1) to provide the opportunity for discussion of any request or complaint by an employee; and (2) to establish the procedures for the processing and settlement of grievances. A 'grievance' as used in this Agreement is any complaint, dispute, or request by an employee or the Union which involves the interpretation, application of, or compliance with, the provisions of this Agreement. Grievances must be initiated and processed promptly and the time limits observed, provided, however, that any time limit provided in the grievance procedure may be changed by mutual agreement of the parties."

3. SECTION 6—ARBITRATION

"Any grievance that has been processed in accordance with the provisions of the preceding Section of this Agreement, but not satisfactorily settled shall be submitted to arbitration before an impartial arbitrator to be selected by mutual agreement of the parties. If, within twenty (20) work days (or a longer period if mutually agreed upon) after receipt of such written request, the parties are unable to agree upon an arbitrator, the Director of the Federal Mediation and Conciliation Service shall be requested to

union filed a complaint in equity seeking a ruling requiring the City to submit the dispute to arbitration. The chancellor sustained the City's preliminary objections on the grounds that the discharge was not an arbitrable issue since it was within the exclusive jurisdiction of the Civil Service Commission of the City of Pittsburgh, and entered a decree dismissing the complaint, which decree was affirmed by the Commonwealth Court. We granted review. The dispositive issue is whether appellee may in this posture assert the defense that the grievance arbitration procedure to which it agreed in 1973 is in conflict with various provisions of the Civil Service Act, 53 P.S. § 23401 *et seq.* (1957 & Supp.1978–79), such that the implementation of the procedure is prohibited by section 703 [4] of the Public Employee Relations Act of 1970 (Act 195). 43 P.S. § 1101.703 (Supp.1978–79). For the following reasons we conclude that appellee may not in the

> submit the names of nine (9) disinterested persons qualified and willing to act as impartial arbitrators. From such list the City shall strike first and the parties shall each alternately strike one name until eight (8) names have been eliminated and the person whose name remains on the list shall be selected to act as the impartial arbitrator. The arbitrator shall submit his decision, in writing, and the decision of the arbitrator so rendered shall be final and binding upon the employee involved and upon the parties to this Agreement except where legislative action is required to implement the arbitrator's award. Where a dispute relates to the scale of wages or benefits in any way, any decision rendered shall not be retroactive more than ninety (90) days beyond the date on which the dispute was first presented as a grievance in writing. The fees and expenses of the arbitration shall be borne in equal shares by the City and the Union. The arbitrator shall not have the right to add to, subtract from, modify, or disregard any of the terms or provisions of this Agreement.
>
> In arbitration the City will not make use of any records of previous disciplinary action against the employee involved if the action was taken two (2) or more years prior to the event which is the subject of such arbitration."

**4.** Section 703 of Act 195 provides:

> The parties to the collective bargaining process shall not effect or implement a provision in a collective bargaining agreement if the implementation of that provision would be in violation of, or inconsistent with, or in conflict with any statute or statutes enacted by the General Assembly of the Commonwealth of Pennsylvania or the provisions of municipal home rule charters.
>
> 43 P.S. § 1101.703 (Supp.1978–79).

instant context assert this defense in order to avoid compliance with agreed upon arbitration procedure.[5]

The framework for public employee collective bargaining in this Commonwealth is provided by Act 195. The purpose of Act 195 is to promote orderly and constructive relationships between all public employers and their employees, to provide adequate means for the minimization and resolution of disputes between the public employer and its employees and to facilitate the development of harmonious relationships between the public employer and its employees. *Id.* § 1101.101. The statutory scheme enacted in this Commonwealth is unusual as compared with other states,[6] in that it affords certain public employees a limited right to strike after exhaustion of negotiation and remediation procedures, *id.* § 1101.1001–1003, and in that it provides for mandatory arbitration of "disputes or grievances arising out of the interpretation of the provisions of a collective bargaining agreement." *Id.* § 1101.903.

In supporting private sector grievance arbitration, the United States Supreme Court has relied upon evidence of Congressional intent, upon the principle of allocating decision-making power to the more expert tribunal, and upon the assumption that labor peace can best be accomplished through enforced use of dispute resolution machinery established by the parties themselves.[7] The rule is that, except when the contract clearly and expressly excludes the dispute from arbitration, the process set up in collective

5. Because of this conclusion, we do not reach the question of whether there is a conflict between the agreement and the Civil Service Act such that the agreement's implementation would be prohibited by section 703 of Act 195. *Id.*

6. *See* R. Vaughn, Principles of Civil Service Law. § 9.3 to 9.4 (1976).

7. *See United Steelworkers v. American Mfg. Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960) (arbitration of labor disputes under collective bargaining agreements is part and parcel of the collective bargaining process itself); *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); Abrams, *The Integrity of the Arbitral Process*, 76 Mich.L.Rev. 231, 232 (1977).

bargaining negotiations must prevail.[8] Even frivolous grievances are to be sent to arbitration because of arbitration's therapeutic value in providing a safety valve for the ventilation of issues which might spill over in wildcat strikes or job actions.[9] In comparing our labor policy towards arbitration with that of the federal labor policy we have observed:

"The General Assembly, far from forbidding arbitration of disputes arising out of a collective bargaining agreement, expressly commands it in section 903 of the PERA, which provides, in pertinent part:

'Arbitration of disputes or grievances arising out of the interpretation of the provisions of a collective bargaining agreement is mandatory . . . . [T]he final step [of the grievance procedure] shall provide for a binding decision by an arbitrator . . . .'

This policy is even stronger than that embodied in federal labor policy. See *United Steelworkers v. American Manufacturing Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). Federal policy merely favors the submission of disputes to arbitration, while the PERA requires it."

*Bd. of Ed. v. Phila. Federation of Teachers*, 464 Pa. 92, 99, 346 A.2d 35, 39 (1975).

It would therefore be totally inconsistent for this Court to be less supportive of grievance arbitration than the courts in the federal system. Discussing our view of the importance of grievance arbitration under the labor policy articulated in Act 195, we stated:

"It is not difficult to perceive the reasons for the statutory requirement that grievances be submitted to arbitration.

**8.** *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 584–85, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960).

**9.** *United Steelworkers v. American Mfg. Co.*, 363 U.S. 564, 568, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960).

> If a dispute arises as to the interpretation or application of the agreement there must be a mechanism for resolving the dispute or the agreement is meaningless. Historically, the primary means of resolving such disputes was the strike, and many agreements in the private sector retain this mechanism for at least some types of dispute. However, resolution of all disputes by resort to economic force is costly to the parties, and more importantly, to the public. The General Assembly therefore chose to make the widely used procedure of labor arbitration mandatory under the PERA. This brings the special expertise of labor arbitrators to bear on the often difficult problems of administering the collective bargaining agreement while assuring parties that their agreement will be effective and guaranteeing both the parties and the public that such disputes will not disrupt peaceful labor relations or interrupt public services."

*Id.*, 464 Pa. at 100, 346 A.2d at 39 (footnotes omitted).

Where the decision to commit a matter to grievance arbitration arises from the terms of a contract between the parties rather than as a result of statutory mandate, the policy to favor this type of dispute resolution is even stronger. Here the alleged obligation to submit the question to arbitration flows directly from the terms of the collective bargaining agreement and not section 903 of Act 195. The Union's argument is premised upon the fact that sections 5 and 6 of the agreement provide the procedure for obtaining redress for the asserted grievance.[10] This Court has recognized that alternative dispute resolutions arrived at voluntarily by the parties to a contract is to be fostered:

> "Fundamental in our law of contracts is the axiom that parties may write their own contracts, and that it is the function of the courts to interpret those contracts and to enforce them as made. It is now recognized in this

10. Whether or not section 903 would require grievance arbitration of this dispute in absence of the language of the collective bargaining agreement is not controlling. The significant fact is that if the Union is correct that the agreement does require arbitration of this issue then the obligation to do so arises from the agreement of the parties.

Commonwealth that the enforcement of agreements by the parties to submit future disputes, that may arise under their agreement, to a tribunal other than the courts is not against public policy and is consistent with the concept of the courts' role in dealing with the contractual relationships of individuals. 'Settlements of disputes by arbitration are no longer deemed contrary to public policy. In fact, our statutes encourage arbitration and with our dockets crowded and in some jurisdictions congested arbitration is favored by the courts.'

. . . . .

In *Wyoming Radio v. National Association of Broadcast Employees and Technicians*, 398 Pa. 183, 186, 157 A.2d 366, 367 (1960), we stated: 'Arbitration is not a makeshift or a subterfuge. It is not an excuse for delay or a fan for the cooling off of tempers. It is a solemn and serious undertaking for the attainment of justice, and when parties engaged in a common enterprise agree to settle by arbitration all differences which may arise between them they are bound by their commitment as much as if they had entered into a stipulation in Court'."

*Ambridge Borough Water Authority v. Columbia*, 458 Pa. 546, 548–49, 328 A.2d 498 (1974). *See also Chester City School Authority v. Aberthaw Construction Co.*, 460 Pa. 343, 333 A.2d 758 (1975); *Flightways Corp. v. Keystone Helicopter Corp.*, 459 Pa. 660, 331 A.2d 184 (1975).

It has also been recognized that these principles are applicable to contracts pertaining to employment. *Ambridge Borough Water v. Columbia, supra.* In *Ambridge*, we held that a party to a contract containing an arbitration clause could not avoid this obligation by subsequently asserting its incapacity to enter the contract in the first instance. *Id.* We believe that decision is instructive here. In both instances, a governmental unit, as employer, entered into an employment contract containing a clause requiring grievance arbitration. At the heart of each case is the fact that a governmental unit employer attempted to avoid arbitration by asserting its own incapacity. In *Ambridge* we reasoned

as follows in deciding that the employer should not be permitted to avoid arbitration:

"Here, there is no question that there was a mutual agreement to arbitrate future disputes. Equally as clear is that there is no challenge to the capacity of the Authority to enter into an agreement providing for arbitration. Furthermore, the parties operated under this agreement for a period of three and one-half years. In this posture the lower court properly refused to reach the merits of appellant's claim of lack of capacity."

*Ambridge Borough Water Authority v. Columbia, supra,* 458 Pa. at 551, 328 A.2d at 501.

In the instant case the challenge is directed to the capacity of the employer to submit this particular subject to arbitration. This distinction however does not require a different result. The relationship between the public employer and the designated bargaining unit is one which must be sustained for years, during which a number of contract negotiations will occur. To sustain a harmonious relationship it is necessary for each of the parties to be pliable and willing to recognize the other's position. Nothing could be more disruptive to such a relationship than a demonstration of bad faith bargaining on the part of one of the parties.

We have already stressed the importance of grievance arbitration in facilitating the development and maintenance of harmonious relationships between the public employer and employee. It is even more supportive of a favorable employment climate where this dispute resolution mechanism arises from the good faith bargaining of the parties rather than being required by statute. To permit an employer to enter into agreements and include terms such as grievance arbitration which raise the expectations of those concerned, and then to subsequently refuse to abide by those provisions on the basis of its lack of capacity would invite discord and distrust and create an atmosphere wherein a harmonious relationship would virtually be impossible to maintain.

■ Good faith bargaining would require that questions as to the legality of the proposed terms of a collective bargaining agreement should be resolved by the parties to the agreement at the bargaining stage.[11] For instance, the section 703 question should have been raised by the City during the 1973 contract negotiations. *Cf. Pennsylvania Labor Relations Board v. State College Area Sch. Dist.*, 461 Pa. 494, 337 A.2d 262 (1975) (alleged conflict with Public School Code of 1949 raised in negotiations by alleging a refusal to bargain in good faith).

■ The City also argues that as a matter of contractual interpretation a dispute over the discharge of an employee is not encompassed by the grievance arbitration procedure of the collective bargaining agreement. *See* notes 2 & 3 *supra*. Having expounded upon the value of dispute resolution via arbitration, it would indeed be inappropriate for this Court to reach this question without an arbitrator first having addressed it, and we decline to do so. The question of the *scope* of the grievance arbitration procedure is for the arbitrator, at least in the first instance. *Bd. of Ed. v. Phila. Federation of Teachers, supra*, 464 Pa. at 103 n. 13, 346 A.2d at 41 n. 13. Therefore, the order of the Commonwealth Court is reversed, and the cause is remanded to the chancellor with instructions to order appellee to submit the issue to arbitration under the terms of the collective bargaining agreement.

It is so ordered.

Each party to pay own costs.

EAGEN, C. J., concurred in the result.

POMEROY, J., filed a dissenting opinion.

11. It should also be noted that persons with the requisite standing who are not parties to a collective bargaining agreement may challenge the effectuation or implementation of the agreement on the grounds that section 703 of Act 195 is offended. *See Fischer v. Rzymek*, 15 Pa.Cmwlth. 105, 324 A.2d 836 (1974) (legality of agreement challenged by Register of Wills and District Attorney).

POMEROY, Justice, dissenting.

The Court in its opinion refuses to face the dispositive issue in this case: whether Section 703 of the Public Employe Relations Act, Act of July 23, 1970, P.L. 563, No. 195, 43 P.S. § 1101.703 (Supp.1978) [herein PERA][1] prohibits the implementation of the arbitration procedure agreed upon by the parties in their collective bargaining agreement ("agreement"). The majority sidesteps this question, and instead addresses a question never tendered by the appellant. The Court holds that the City of Pittsburgh ("City") may not assert a Section 703 defense "in order to avoid compliance with agreed upon arbitration procedure." This estoppel theory, altogether novel in this Court's decisions concerning Section 703, should not be the basis of today's reversal of the lower courts. What Mr. Justice NIX said for the Court in *Reed v. Sloan*, 475 Pa. 570, 574 n. 4, 381 A.2d 421 (1977), is fully applicable here: "This issue is not properly before this Court, since it is not the issue raised by the appellant. *Commonwealth v. Branham*, 467 Pa. 605, 359 A.2d 766 (1976); *Phillips H.F., Inc. v. Continental Bank*, 467 Pa. 43, 354 A.2d 542 (1976); *School Dists. of Deer Lakes & Allegheny Valley v. Kane*, 463 Pa. 554, 345 A.2d 658 (1975); *Benson v. Penn Central Transportation Company*, 463 Pa. 37, 342 A.2d 393 (1975); *Wiegand v. Wiegand*, 461 Pa. 482, 337 A.2d 256 (1975)."

In drafting the PERA, the General Assembly recognized that a number of potential subjects of collective bargaining were already regulated by other statutes. It obviously decided that the new procedures of the PERA were not to supersede the handling of such matters in the manner prescribed by preexisting legislation. Thus Section 703 was included in PERA in order to preclude the implementation

1. Section 703 provides:
    "The parties to the collective bargaining process shall not effect or implement a provision in a collective bargaining agreement if the implementation of that provision would be in violation of, or inconsistent with, or in conflict with any statute or statutes enacted by the General Assembly of the Commonwealth of Pennsylvania or the provisions of municipal home rule charters."

of a provision in a collective bargaining agreement "in violation of, or inconsistent with, or in conflict with" such other legislation. This Court in the past has, I believe, circumvented the intended meaning of Section 703 by a kind of judicial legislation. In *Pennsylvania Labor Relations Board v. State College Area School District*, 461 Pa. 494, 510, 337 A.2d 262, 270 (1975), it construed that section to mean that an item is improperly included in a collective bargaining agreement only if that item is *in violation of* existing law. Relying upon *State College*, the Court in *Board of Education v. Philadelphia Federation of Teachers*, 464 Pa. 92, 346 A.2d 35 (1975), found that the discharge of a teacher as ordered by an arbitrator acting pursuant to a collective bargaining agreement, was not in violation of the School Code of 1949 [2] notwithstanding that the School Code gives to local school boards the right to discharge teachers. Following the reasoning of *State College* and *Philadelphia Teachers*, the Court again found no violation of Section 703 in *Milberry v. Board of Education*, 467 Pa. 79, 354 A.2d 559 (1976), a case in which an unsatisfactory rating of a teacher was submitted to arbitration under the provisions of a collective bargaining agreement.

Although in the three cases cited above I disagreed with the Court's analysis of the scope and intent of § 703 of PERA,[3] the Court in each case was at least addressing the proper issue, namely, whether the collective bargaining agreement ran afoul of Section 703. Although the case at bar involves the same problem, the Court evades it, as stated above, by holding that the City of Pittsburgh as employer is estopped to raise the question. The majority suggests that because the City entered into a collective bargaining agreement containing an arbitration clause,[4] the City's subsequent

2. Act of March 10, 1949, P.L. 30, art. V, §§ 510, 514, 24 P.S. §§ 5–510, 5–514 (1962).

3. See *State College, supra*, 461 Pa. at 513 n. 1, 337 A.2d at 271 n. 1 (concurring opinion); *Board of Education, supra*, 464 Pa. at 108, 346 A.2d at 45 (dissenting opinion); *Milberry, supra*, 467 Pa. at 85, 354 A.2d at 563 (concurring opinion).

4. Section 903 of PERA, 43 P.S. § 1101.903, reads in relevant part:
   "Arbitration of disputes or grievances arising out of the interpretation of the provisions of a collective bargaining agreement is

failure to arbitrate the propriety of its discharge of the particular employee involved is indicative of a lack of good faith on the City's part, and injected discord and distrust into the relationship between the City and its employees. This estoppel approach may be appropriate in unfair labor practice cases, but in my view it has no place in a case such as this where it is incumbent on the courts to decide whether or not the agreement in question is restricted in its operation by the restraints of Section 703.[5]

Because the majority, for reasons unclear to me, has not seen fit to address the merits of the case as briefed and argued by the parties and decided by the courts below, I need not consider the merits exhaustively in this opinion. I therefore merely sketch my reasons for believing that the Court is wrong in result as well as in rationale.

An integral part of the government of the City of Pittsburgh as a city of the second class is the civil service system, introduced over seventy years ago by the Civil Service Act, Act of May 23, 1907, P.L. 206, 53 P.S. § 23431 *et seq.* (1957). The primary purpose of civil service, of course, was to ensure that selection and retention of employees was based on merit, and to protect both prospective and present employees from the ravages of the spoils system. See, e. g.,

mandatory. The procedure to be adopted is a proper subject of bargaining with the proviso that the final step shall provide for a binding decision by an arbitrator or a tri-partite board of arbitrators as the parties may agree."

5. Given the language of Section 703, which anticipates that a provision may find its way into a collective bargaining agreement, the implementation of which might violate or be in conflict or inconsistent with a statute other than PERA, it is difficult to see how the City can be held culpable for allowing such a provision in the agreement. At all events, the City cannot be said to have waived its right to argue in this Court that the dismissal in question was not subject to arbitration. It expressly reserved, in the management rights clause of the agreement (Section 3), the right to discipline and discharge employees. It stipulated, however, that any such action would be only "for just cause, as defined in the Civil Service Law" (Record at 9a). Without deciding whether this provision is dispositive of the merits of the arbitrability dispute, it at least does not preclude the City's right so to argue.

*Geis's Appeal*, 341 Pa. 413, 19 A.2d 368 (1941). Thus the Civil Service Act contains elaborate provisions to guard against abuse in the hiring and firing of classified employees subject to the Act. Section 20 of the Act, 53 P.S. § 23453 provides that no employee subject to the Act "shall be removed, discharged or reduced in pay or position except for just cause . . . ." It is further provided that no civil service employee shall be discharged until he has been furnished a written statement of the reasons for such action and given the opportunity to make a written answer and furnish it to the removing officer.[6]

"Just cause" is not a defined term in the Civil Service Act, but its definition is found in the Rules of the Civil Service Commission of the City of Pittsburgh, ("the Commission"; see note 7, *supra*) adopted by the Commission as authorized by the Civil Service Act.[7] The rules further provide that a dismissed employee shall have ten days within which to file

**6.** Section 20 also provides that a copy of the statements of the employer's reasons for discharge and of the written answer of the employee shall be furnished to the civil service commission and entered on its records.

Section 2 of the Civil Service Act provides for "a civil service commission in each city of the second class, consisting of three commissioners to be appointed by the mayor." 53 P.S. § 23432.

**7.** Section six of the Civil Service Act gives the commission the authority to "prescribe, amend and enforce rules and regulations for carrying into effect the provisions of this act." 53 P.S. § 23436.

Rule X of the rules of the Commission in effect at the time of the discharge here in question (1973) provided that "a just cause may be, *inter alia*,

(A) Physical or mental disability.

(B) Delinquency, misconduct, incompetence, or inefficiency.

(C) Lack of work, abolition of position, or failure of City to provide salary therefor.

(D) Termination of vacancy which was occasioned by leave of absence granted for military or other national defense duty." The Commission's rules have been revised as of October, 1976, but no change of substance has been made in this portion of Rule X. The prefatory note by the Commission to the new rules mentions the enactment of PERA and the Civil Rights Acts of 1964, as amended. The note then states that the revised rules "preserve the principles of equal opportunity employment and sound labor-management relations." Civil Service Statutes, as amended, and Rules Governing the Civil Service of the City of Pittsburgh, 1976.

an appeal with the Commission "alleging that his reduction or dismissal was made without just cause and/or that the provision of the Act of 23 May 1907 and/or the Rules of the Commission were not observed." The Commission at its discretion determines whether or not a public hearing is warranted, and then proceeds to rule on the appeal.

I cannot accept the argument of the appellant that an arbitration of a grievance concerning a dismissal on the ground that just cause was absent is merely a supplementary or intermediate step in the civil service procedure, for there is nothing to prevent a grievance being filed at any stage of the civil service proceeding, whether before or after the dismissal has occurred, or before or after an appeal has been taken and decided. Moreover, the contract at issue here provides (Section 6, Record at 14a) that the arbitrator's award shall be "final and binding upon the employee involved and upon the parties to this Agreement . . . ." Thus, what I said in *Board of Education, supra,* is pertinent:

"The action of the [Civil Service Commission on appeal] would then have been an exercise in futility, for the entire case would then be referred to arbitrators; the arbitrators would sit, in effect, as a super [civil service commission] in a matter of [employe] discipline and dismissal, but not subject to the provisions of the [Civil Service Act and Commission rules] governing the action of [city officials], and not subject to appeal." 464 Pa. at 115–16, 346 A.2d at 48.

Finally, any argument that arbitration under the collective bargaining agreement is permitted with respect to the propriety of a dismissal of a classified employee must, I submit, evaporate in light of the unmistakably clear declaration of exclusivity contained in the Civil Service Act itself:

"It is intended by this act to furnish a complete and exclusive system for the appointment, promotion, reduction, transfer, removal or reinstatement of all officers, clerks, laborers and other employes in the civil service of cities of the second class in this commonwealth." Act of May 23, 1907, P.L. 206, § 28, 53 P.S. § 23461.

Thus I conclude that this is not a case where the matter as to which a grievance is filed and the arbitration sought is supplementary to and not a substitution for a statutory scheme antedating PERA. See *Milberry, supra*, 467 Pa. at 85, 354 A.2d at 563 (concurring opinion). Rather, the case at bar involves an attempted procedure in direct contravention of a preexisting statutory scheme, a procedure therefore interdicted by Section 703. See *Board of Education, supra*, 464 Pa. at 108, 346 A.2d at 45 (dissenting opinion).

Accordingly, I would affirm the order of the Commonwealth Court.