# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Frank Weber, Charles Barr, Hugh Biddle, Channing Jackson, Paul S. Miller, Jr., Joseph Saunders, Thomas Curry, Greg Ferrell, Gerald Harder, George Adams, Terry Wade, Henry Riebold and Joseph Terry, | : : : : : : : | |
| Appellants | : : | |
| v. | : : | No. 2164 C.D. 2014 |
| Borough of Wilkinsburg | : | Argued: November 16, 2015 |

BEFORE:   HONORABLE BERNARD L. McGINLEY, Judge
            HONORABLE RENÉE COHN JUBELIRER, Judge
            HONORABLE ROCHELLE S. FRIEDMAN, Senior Judge

OPINION NOT REPORTED

**MEMORANDUM OPINION**
**BY JUDGE COHN JUBELIRER**                    **FILED:  December 29, 2015**

Retired Borough of Wilkinsburg (Borough) police officers Frank Weber, Charles Barr, Hugh Biddle, Channing Jackson, Paul S. Miller, Jr., Joseph Saunders, Thomas Curry, Greg Ferrell, Gerald Harder, George Adams, Terry Wade, Henry Riebold and Joseph Terry (Retirees) appeal from the November 6, 2014 Order of the Court of Common Pleas of Allegheny County (trial court) dismissing their Complaint against the Borough disputing the amount of monthly retirement benefits due them under the collective bargaining agreements between the parties. On appeal, Retirees argue that the trial court erred by misinterpreting

the collective bargaining agreements, by rejecting their estoppel and ratification arguments, and by declining to consider Retirees' argument that three Retirees never received excess payments in lieu of post-retirement medical insurance. Discerning no error, we affirm.

The dispute regarding the amount of monthly benefits due Retirees arises from the terms of two collective bargaining agreements between the Wilkinsburg Police Officers Association (WPOA)[1] and the Borough.[2] The principal collective bargaining agreement was effective from 1990 to 1995 (1990-1995 CBA). Retirees base their claims entirely on the 1990-1995 CBA and the successor CBA in effect from 1996 to 1998 (1996-1998 CBA). The latter CBA did not materially change the terms of the 1990-1995 CBA.

The 1990-1995 CBA was driven by the Borough's classification as a financially distressed municipality under the terms of the Municipalities Financial Recovery Act.[3] Prior to the 1990-1995 CBA, retired Wilkinsburg police officers were entitled to health insurance paid by the Borough from the date of retirement throughout their lifetime. These health insurance benefits were paid from the

---

[1] WPOA is the union that formerly represented the Borough's police officers.

[2] The trial court did not set forth specific findings of fact; however, the parties did enter into a Joint Stipulation of Facts (Joint Stipulation) including Joint Exhibits in support of the Joint Stipulation. The Joint Exhibits consist of the applicable collective bargaining agreements, a 1995 actuarial valuation report, deposition testimony, and other documents. The Borough also submitted affidavits into the record. As such, the recitation of the background of this matter is based on the Joint Stipulation, the Joint Exhibits, and the other documents submitted by the parties into the record.

[3] Act of July 10, 1987, P.L. 246, as amended, 53 P.S. §§ 11701.101–11701.712.

2

Borough's general operating fund. During the negotiations for the 1990-1995 CBA, the Borough sought to reduce its general operating fund liability by reducing the duration of the police officers' post-retirement health insurance benefits. The Borough and the WPOA agreed to a limitation on retirees' post-retirement health insurance benefits that capped a retiree's entitlement to Borough-paid health insurance to the first three years after retirement, followed by a payment in lieu of post-retirement health insurance benefits. (Joint Ex. A, Article VIII, Section H of 1990-1995 CBA, R.R. at 505a-07a.)

Prior to the 1990-1995 CBA, the Borough's Police Pension Plan (Plan) did not provide for a monthly cost of living adjustment (COLA) to a retiree's base pension benefit. The base pension benefit for a retired police officer was based on 50 percent of the retiree's final average monthly salary (FAMS). The Borough agreed in the 1990-1995 CBA to provide a pension COLA. Article III, Section 2 of the 1990-1995 CBA provides, in pertinent part:

> The Borough agrees to implement the following changes in the Police Pension Plan, if the Borough is able to obtain an actuarial study of the Plan which concludes that such changes will not impair actuarial soundness of the Plan and may be implemented, at no cost to the Borough, based upon anticipated state aid:
>
> 1. Cost of living adjustment, in accordance with At [sic] 600[4], up to a maximum of seventy-five (75%) percent.

---

[4] The parties stipulated that "At [sic] 600" is a reference to what is commonly known as the Municipal Police Pension Law, Act of May 29, 1956, P.L. 1804, as amended, 53 P.S. §§ 767-778 ("Act 600"). (Joint Stipulation at ¶ 11, R.R. at 472a.)

3

(Joint Stipulation of Facts (Joint Stipulation) at ¶ 10, R.R. at 472a; Joint Ex. A, 1990-1995 CBA, R.R. at 495a.)

Section 5(g)(1) of Act 600 authorizes police pension COLAs but limits the aggregate amount as follows:

> [t]he ordinance or resolution establishing the police pension fund may provide for a cost of living increase for members of the police force receiving retirement benefits. The cost of living increase shall not exceed the percentage increase in the Consumer Price Index from the year in which the police member last worked, shall not cause the total police pension benefits to exceed seventy-five per centum of the salary for computing retirement benefits and shall not cause the total cost of living increase to exceed thirty per centum. No cost of living increase shall be granted which would impair the actuarial soundness of the pension fund.

53 P.S. § 771(g)(1). In sum, Section 5(g)(1) limits a retiree's total pension benefit (base pension benefit plus COLA) to 75 percent of the salary used for computing retirement benefits (here the FAMS) and limits any COLA increase to 30 percent.

After ratification of the 1990-1995 CBA, the Borough enacted Ordinance No. 2466 to amend its Plan to provide the pension COLA. The Ordinance provided that the total COLA as applied to a retiree's "retirement benefit shall not exceed thirty percent (30%)." (Joint Stipulation at ¶ 18, R.R. at 474a; Joint Ex. C, Ordinance, R.R. at 593a-96a.) The Borough also filed an actuarial valuation report in compliance with the Municipal Pension Plan Funding Standard and Recovery

4

Act.[5]  In the section of the report that describes post retirement adjustments the Borough stated as follows:

> Effective on the date a retiree becomes eligible under the terms of the collective bargaining agreement, a retiree will receive an increase in the monthly benefit equal to the percentage change in the CPI-W during the last year times the pension benefit. The total of all increases may not exceed 30% of the retiree's original benefit nor may the sum of the retiree's benefit and all increases exceed 75% of [the] Average Monthly Salary used to compute the original benefit.

(Joint Ex. D, 1995 Actuarial Valuation Report at 16, R.R. at 613a.)  The parties stipulated before the trial court that: "[t]here was no intention to violate Act 600 when the parties approved the 1990-1995 CBA and the 1996-1998 CBA; it was the intention of the Borough and the WPOA that the pension plan comply with Act 600." (Joint Stipulation at ¶ 62, R.R. at 482a.)[6]

Retirees received two separate monthly payments under the 1990-1995 CBA: the payment from the Plan (consisting of the base pension benefit plus the COLA); and a payment from the Borough's general fund that represented the payment in lieu of post-retirement health insurance.  At some point during the

---

[5] Act of December 18, 1984, P.L. 1005, as amended, 53 P.S. §§ 895.101-895.1131 ("Act 205").

[6] A close reading of the 1990-1995 CBA shows that the negotiated limitation had three principal advantages to the Borough: (1) it included a specific limitation on the Borough's general fund liability so that the Borough would not have to pay more than $350.00 per month to a retiree; (2) the Borough's general fund liability was reduced based on the amount that the retiree receives as a monthly COLA from the Borough's police pension fund; and (3) the total value of the pension fund COLA payments and the Borough's general fund payments was capped at $600 per month for each retiree.  (Joint Ex. A, Article VIII, Section H of 1990-1995 CBA, R.R. at 505a-07a.)

period 2005-2006, the Borough's Finance Director and the Borough Manager, after meeting with some of Retirees, increased the monthly payment from the Borough's general fund to an amount that totaled 75 percent of Retirees' FAMS. Affidavits and deposition transcripts show that the Finance Director and the Borough Manager took this action without specifically advising Borough Council (Council) or consulting with the Borough Solicitor. (Borough's Ex. A, Affidavit of Borough Council Member, R.R. at 96a; Borough's Ex. B, Affidavit of Borough Council President, R.R. at 99a; Joint Ex. F, Dept. of Finance Director at 30, R.R. at 687a.) Council did not specifically authorize the Borough Manager or the Finance Director to exceed the limits on the payments from the Borough's general fund to Retirees in lieu of post-retirement health insurance that are provided in the 1990-1995 CBA. (Borough's Ex. A, Affidavit of Borough Council Member, R.R. at 97a; Borough's Ex. B, Affidavit of Borough Council President, R.R. at 99a.) Council also did not approve a retroactive amendment to the 1990-1995 CBA or the 1996-1998 CBA that contained the same terms. (Borough's Ex. A, Affidavit of Borough Council Member, R.R. at 97a; Borough's Ex. B, Affidavit of Borough Council President, R.R. at 99a.) When the Borough became aware of the increased payments to Retirees, it ceased making the increased payments and notified Retirees in June 2010 that the payments from the Borough's general fund would be adjusted to what the Borough considered to be the correct amounts. (Borough's Answer and New Matter to Complaint at ¶ 10, R.R. at 32a.)

Retirees filed a Complaint against the Borough, contending that the 1990-1995 CBA guaranteed they would be paid an amount equal to 75 percent of their FAMS from pension and non-pension fund sources. The Borough filed an Answer

6

and New Matter wherein it counterclaimed; asserting that Retirees' retention of the overpayments constituted conversion and/or unjust enrichment, and sought the return of the excess payments.

This action was assigned to the trial court's complex litigation assignment program. Thereafter, the trial court directed that the parties conduct discovery, which included deposition transcripts, affidavits, and other documents. The parties also entered into the Joint Stipulation and submitted Joint Exhibits in support of the stipulated facts. After the close of discovery, the parties filed briefs and the Borough filed a motion for entry of judgment. Upon consideration of the record and oral argument by the parties, by Order entered on November 6, 2014, the trial court dismissed Retirees' Complaint and the Borough's counterclaims. In an opinion in support of its Order, the trial court held that the parties' relationship is governed by the 1990-1995 CBA and the 1996-1998 CBA containing the same terms, that the Borough never guaranteed Retirees that they would be paid an amount equal to 75 percent of their FAMS from pension and non-pension fund sources, that the Borough took steps to implement the 1990-1995 CBA in accordance with the provisions of Act 600, and that to apply the COLA provision as Retirees want would result in benefits not in accordance with Act 600. This appeal by Retirees followed.

Retirees raise three issues for our consideration.[7] Retirees first argue that the Borough is estopped from refusing to pay the full 75 percent of the FAMS that

---

[7] Contract interpretation is a question of law. See Kripp v. Kripp, 849 A.2d 1159, 1164 n.5 (Pa. 2004). "Our standard of review over questions of law is *de novo* and to the extent

*(Continued…)*

7

Retirees claim is required by the 1990-1995 CBA, relying on Fraternal Order of Police, E.B. Jermyn Lodge # 2 v. Hickey, 452 A.2d 1005 (Pa. 1982), and on Pittsburgh Joint Collective Bargaining Committee v. City of Pittsburgh, 391 A.2d 1318 (Pa. 1978) (both holding that a municipality is estopped from refusing to honor as contrary to statute a contract term to which it agreed). Retirees argue here, as they did before the trial court, that the Borough in the 1990-1995 CBA promised to pay COLA adjustments until the maximum monthly payment to Retirees, including the basic pension benefit of 50 percent, was 75 percent of the FAMS. Citing Hickey and Pittsburgh Joint Collective, Retirees argue that the Borough cannot voluntarily agree to a provision in a collective bargaining agreement and subsequently refuse to honor it by claiming it is more generous than permitted by law. They contend that the provision from the 1990-1995 CBA that states "Cost of living adjustment, in accordance with At [sic] 600, up to a maximum of seventy-five (75%) percent" promises COLA adjustments until their pension benefits are 75 percent of their FAMS.

In response, the Borough argues that the 1990-1995 CBA by its very terms does not authorize payments to Retirees from the Borough's general fund that exceed the formula in Article III, Section 2 of the 1990-1995 CBA, for the cash payments in lieu of post-retirement health insurance. As those terms are unambiguous, the intent of the parties is clear and must be given effect without reference to matters outside the contract. The Borough further notes that the parties stipulated that the Borough and the WPOA intended the 1990-1995 pension

necessary, the scope of our review is plenary as this court may review the entire record in making its decision." Id.

8

COLA to be "in accordance with" Act 600's COLA limitations, including the restriction that aggregate COLAs cannot exceed 30 percent of a retiree's base pension benefit.

The Borough also argues that Retirees have no evidence to support the claim that the Borough promised to pay them an amount equal to 75 percent of their FAMS through a combination of Plan payments and the general fund payments in lieu of post-retirement health insurance benefits, and that Retirees cannot support a claim for promissory or equitable estoppel. As to the estoppel issue, the Borough first notes that one cannot be both in violation of an express contract and liable under a promissory estoppel theory as the latter is a quasi-contract doctrine, citing Ruby v. Abington Memorial Hospital, 50 A.3d 128 (Pa. Super. 2012). The Borough also argues that Retirees do not meet the elements of promissory estoppel.

Initially, we conclude that the Borough is correct that estoppel, including promissory estoppel,[8] is not a viable theory of recovery in this matter. The 1990-1995 CBA is an express contract so promissory estoppel, a quasi-contract doctrine, will not lie. Ruby, 50 A.3d at 136 (holding that "[i]n Pennsylvania, the quasi-contractual doctrine of unjust enrichment (*quantum meruit*) does not apply when a written agreement or express contract exists between the parties"). Here, the trial court correctly held that the parties' relationship is governed by the 1990-1995

---

[8] For the doctrine of promissory estoppel to apply: (1) the promisor must make a promise that he should reasonably expect to induce action or forbearance on the part of the promisee; (2) the promise must actually induce such action or forbearance; and (3) injustice can be avoided only by enforcement of the promise. Shoemaker v. Commonwealth Bank, 700 A.2d 1003, 1006 (Pa. 1997).

CBA and the 1996-1998 CBA containing the same terms.[9] As the trial court noted, Retirees do not rely on any other documents for their claims and so stipulated. (Joint Stipulation at ¶ 49, R.R. at 480a.) As such, we must ascertain the intent of the parties from the applicable CBAs. See Krip v. Krip, 849 A.2d 1159, 1163 (Pa. 2004) (stating that "[i]n cases of a written contract, the intent of the parties is the writing itself"). "When the terms of a contract are clear and unambiguous, the intent of the parties is to be ascertained from the document itself." Id.

We further conclude that the cases cited by Retirees, Hickey and Pittsburgh Joint Collective, do not support their estoppel argument. In Hickey, the collective bargaining agreement between Scranton and its police required that the police chief be appointed from within the ranks. Hickey, 452 A.2d at 1006. A subsequently elected mayor argued that this provision was illegal because it limited the mayor's powers to make appointments that were granted by the city's home rule charter. Id. The Supreme Court held that the city could not object to the illegality of a contractual provision to which it had voluntarily agreed during collective bargaining. Id. at 1008. Similarly, in Pittsburgh Joint Collective, the city sought to avoid grievance arbitration of the discharge of a parks department employee on the grounds that the grievance arbitration language in the collective bargaining agreement was illegal because it conflicted with statutory law. Pittsburgh Joint Collective, 391 A.2d at 1320. The Supreme Court ruled against the city, finding that it could not assert the illegality of the contractual language to which it had agreed. Id. at 1322-23.

---

[9] All Retirees retired before January 1, 1997. (Joint Stipulation at ¶ 2, R.R. at 470a.)

10

Here, the Borough is not arguing that the pension COLA provided in the 1990-1995 CBA was illegal. Rather, the parties have stipulated that the pension COLA was intended to be "in accordance with [Act] 600." (Joint Stipulation at ¶ 10, R.R. at 472a.) The Borough is not seeking to void as illegal any language in the 1990-1995 CBA but rather to give effect to the provision in that CBA and administer the Plan in accordance with Act 600. Thus Hickey and Pittsburgh Joint Collective are inapposite.

Accordingly, we must review the express terms of the 1990-1995 CBA to determine whether Retirees are entitled to a COLA benefit until their pension benefits equal 75 percent of their FAMS. As correctly identified by the trial court, Act 600 is the relevant statute at issue here. As described above, Section 5(g)(1) of Act 600 limits a retiree's total pension benefit (base pension benefit plus COLA) to 75 percent of the salary used for computing retirement benefits (here the FAMS) and limits any COLA increase to 30 percent. The parties stipulated that:

> Applying Act 600's 30 [percent] limitation on aggregate COLAs results in a retired police officer receiving a maximum payment from the Borough's [Plan] equal to 65 [percent] of that retired officer's FAMS, consisting of the "base" pension benefit of 50 [percent] of FAMS plus the aggregate COLA (30 [percent] of the 50 [percent] of a retiree's FAMS, which equals 15 [percent] of a retiree's FAMS).

(Joint Stipulation at ¶ 34, R.R. at 477a.) The trial court also found that Retirees are receiving the full amount of benefits permitted under Act 600.

We agree with the trial court that the Borough, by the plain language of Article III, Section 2 of the 1990-1995 CBA, did not authorize payments in excess of those allowed under Act 600. This section of the CBA provides for a "[c]ost of

11

living adjustment, in accordance with At [sic] 600, up to a maximum of seventy-five (75%)." (Joint Stipulation of Facts at ¶ 10, R.R. at 472a.) Retirees interpret this provision as a promise to pay COLAs until their pension benefits equal 75 percent of their FAMS through a combination of Plan payments and the general fund payments in lieu of post-retirement health insurance benefits. However, this contention does not give effect to the CBA language "in accordance with At [sic] 600."

Moreover, Article VIII, Section H of the 1990-1995 CBA, by its plain language, limits the Borough's general fund liability to only $350 per month, and then only if the monthly COLA that a retiree was receiving from the pension fund was less than $250.[10] As Retirees' claims rely only on the 1990-1995 CBA and the

_____

[10] Article VIII, Section H of the 1990-1995 CBA provides as follows:

Effective January 1, 1990, the payment by the Borough for post-retirement medical insurance shall be eliminated, except as provided in this Paragraph. Any full-time police officer who retires on or before December 31, 1995 shall be entitled to receive medical insurance (Blue Cross/Blue Shield) for the retiree and spouse, for a period of three (3) years from the date of retirement. Any retiree who is eligible for medical insurance through the employer of the retiree or the retiree's spouse shall not be provided with said medical insurance during the three (3) year period. Thereafter, all post-retirement medical insurance shall be discontinued. No police officer retiring after December 31, 1995 shall be entitled to any post-retirement medical insurance. After an eligible police officer has been retired for a period of three (3) years, he shall be entitled to receive a monthly payment in lieu of post-retirement medical insurance, up to a maximum of Six Hundred ($600.00) Dollars. It is the intention of the parties that the primary source of funding for the payment in lieu of post-retirement medical insurance shall be in the form of any increase in pension benefits resulting from the Act 600 Pension COLA as set forth in Article Ill. The Borough shall pay the difference between Six Hundred ($600.00) Dollars per month and any increase in pension benefits resulting from the Act 600 COLA. Any obligation of the Borough to make payment in lieu of post-retirement medical insurance shall terminate upon

*(Continued…)*

1996-1998 CBA, which contain identical terms, their argument lacks a basis in the record. Retirees are eligible to receive post-retirement health insurance for the first three years after they retire. Thereafter, Retirees receive payments in lieu of post-retirement health insurance that cannot exceed $600 per month. The payments have two origins: the pension COLA payment from the Plan; and a check from the Borough's general fund. As a retiree's monthly pension COLA increases, the Borough's general fund payment to the retiree decreases; however, there is a $350 per month cap on the Borough's general fund payment obligation regardless of the size of the retiree's monthly pension COLA payment. Retirees, therefore, are not

---

the death of the police officer. However, under no circumstances shall the Borough be obligated to pay more than Three Hundred Fifty ($350.00) Dollars per month. (Example No. 1: If increase resulting from Act 600 COLA is Two Hundred ($200.00) Dollars per month, the Borough shall pay Three Hundred Fifty ($350.00) Dollars per month. Example No. 2: If increase from Act 600 COLA is Four Hundred ($400.00) Dollars per month, the Borough shall pay Two Hundred ($200.00) Dollars per month.) Any police officer who retired during the period of January 1, 1990 through the Ratification Date shall be entitled to receive the above payment in lieu of medical insurance coverage from the Borough, if such retired police officer signs an agreement to forego any entitlement to the post-retirement medical insurance benefit which existed on the date of his or her retirement. If said retired police officer signs such an Agreement, the medical insurance coverage provided by the Borough shall be discontinued three (3) years after the date of retirement, and the retired police officer shall begin receiving the monthly payment in lieu of medical insurance effective the first day of the following month. In such case, the retired police officer shall also be entitled to receive the payments, without interest, during the period he was actually employed by the Borough, as set forth in Article I, Paragraph B. If any such retired police officer refuses to sign an Agreement to forego post-retirement medical insurance, such retired police officer shall not be entitled to any of the benefits resulting from any changes in the 1990-95 Agreement. The above payment in lieu of health insurance coverage shall not apply to any police officer hired after January 1, 1993.

(Joint Ex. A, Article VIII, Section H of 1990-1995 CBA, R.R. at 505a-07a.)

guaranteed that they will receive $600 per month (whether they actually do depends on the amount of the pension COLA they are receiving), but the Borough is guaranteed that its general fund liability towards a retiree will never exceed $350 per month and will always be reduced once the retiree's monthly pension COLA exceeds $250 per month.

The record shows that the Borough administered the 1990-1995 CBA in this manner until the Borough Finance Director facilitated the overpayments. The Borough officials who facilitated the overpayments to Retirees lacked the authority to do so and lacked the authority to enter into new contracts and modify existing ones. See Section 1401(b) of the Borough Code, 8 Pa. C.S. § 1401(b) (referring to borough council's power to enter into contracts); In the Matter of the Arbitration Between Borough of Media and Members of the Media Police Department, 397 A.2d 844, 846 (Pa. 1979) (referencing "legitimate exercise of borough council authority" to enter into two-year collective bargaining agreement). Once Council discovered the overpayments it halted them and resumed payments consistent with the 1990-1995 CBA and prior practice. Moreover, the parties stipulated that the Borough and the WPOA intended the 1990-1995 pension COLA to be "in accordance with" Act 600's COLA imitations, including the restriction that aggregate COLAs cannot exceed 30 percent of a retiree's base pension benefit.

Accordingly, the trial court did not err when interpreting the express language of the 1990-1995 CBA, in conjunction with Act 600, to find that the 1990-1995 CBA does not entitle Retirees to a total pension benefit equal to 75 percent of their FAMS.

14

Next, Retirees argue that the Borough "ratified" the actions of the Finance Director when Council approved the increased payments and, thus, the Borough is bound by those actions. The Borough contends that the Finance Director's unilateral and unauthorized disregard of the formula for the Borough's general fund payments in lieu of post-retirement health insurance did not create any enforceable right in Retirees as the Borough acted within its rights to correct the overpayments when it returned Retirees to the correct contractual formula.

Retirees argue that Council's approval of payments from the general fund to Retirees in the amounts written by the Finance Director, essentially amended the terms of the CBA, binding the Borough thereafter. However, the parties stipulated that it was not within the Borough Finance Director's authority "to change the terms of the collective bargaining agreements between the Borough and the WPOA"; the Finance Director "was not familiar with Act 600's limitation on aggregate COLA pension payments"; the Finance Director's "understanding, based on his review of the 1990-1995 CBA was that [Retirees] were entitled to a pension benefit equal to 75% of FAMS"; and it was not the Finance Director's "intention to disregard the terms of the 1990-1995 CBA." (Joint Stipulation at ¶¶ 41-44, R.R. at 479a.) The parties stipulated that "[w]hen Council approves payments to [Retirees] from the Borough's general fund, the only information on the bill run that was provided for Council approval of the checks [shows] a payment of a medical insurance reimbursement, not a pension benefit." (Joint Stipulation at ¶ 45, R.R. at 479a.) The payment information that Council approves refers to a specific accounting distribution number (01491194) that indicates that the payments are made from the Borough's general fund (01); for retirement benefits

15

(491); and for the payment in lieu of post-retirement health insurance (194). (Joint Stipulation at ¶ 46, R.R. at 479a-80a.)

As the duly elected officers of the Borough, only Council could authorize amending a collective bargaining agreement with the WPOA. See 8 Pa. C.S. § 1401(b); Borough of Media, 397 A.2d at 846. The parties' stipulation confirms that such authorization never occurred. Council members averred that the Finance Director never advised Council that he was implementing the 1990-1995 CBA or the 1996-1998 CBA differently and that Council never authorized anyone to do so. (Borough's Ex. A, Affidavit of Borough Council Member, R.R. at 96a-97a; Borough's Ex. B, Affidavit of Borough Council President, R.R. at 99a.) Council's mere approval of these payments, under these circumstances, could not amend the CBA – either to increase or decrease the benefits negotiated by the Borough and WPOA.

Finally, Retirees argue that the trial court erred when it found that three of their number waived the claim that their payments did not violate the provision that the Borough was not required to pay more than $350 per month in lieu of post-retirement medical insurance because they never received in excess of $350 per month. Retirees contend that if we find that the trial court did err in finding a waiver, we must decide if the additional payments to the three Retirees violate the contractual provision even if the three Retirees never received more than $350 per month. The Borough argues that Retirees waived this issue and that even if not waived Retirees' claim is based on a misreading of the 1995-1996 CBA.

16

The trial court found a waiver. Aside from arguing that the trial court should not have found a waiver of this issue, Retirees offer no argument to support their claim. We need not decide that issue as it is clear from the record that, even if it was not waived, Retirees' claim misconstrues the $350 monthly cap on the Borough's general fund payments in lieu of post-retirement medical insurance. As we noted earlier, Article VIII, Section H of the 1990-1995 CBA, by its plain language, limits the Borough's general fund liability to only $350 per month, and then only if the monthly COLA that a retiree was receiving from the pension fund was less than $250. The Borough pays the difference between $600 and the Retiree's aggregate monthly pension COLA, subject to an absolute cap of $350; it is not a guarantee of a $350 monthly payment from the Borough's general fund. As such, the fact that the three Retirees never received payment in excess of $350 is irrelevant.

For the foregoing reasons, we affirm the trial court's Order.

_____
**RENÉE COHN JUBELIRER, Judge**

17

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Frank Weber, Charles Barr, Hugh Biddle, Channing Jackson, Paul S. Miller, Jr., Joseph Saunders, Thomas Curry, Greg Ferrell, Gerald Harder, George Adams, Terry Wade, Henry Riebold and Joseph Terry, | : : : : : : : | |
| Appellants | : : | |
| v. | : : | No. 2164 C.D. 2014 |
| Borough of Wilkinsburg | : | |

# **O R D E R**

   **NOW**,  December 29, 2015,  the November 6, 2014 Order of the Court of Common Pleas of Allegheny County, entered in the above-captioned matter, is **AFFIRMED**.

_____
**RENÉE COHN JUBELIRER, Judge**